**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3853, No. 13-3854, No. 13-3855, No. 13-4070,
No. 13-4269, No. 13-4325
_____

In Re: Commonwealth's Motion to Appoint Counsel Against
or Directed to Defender Association of Philadelphia

> The Defender Association of
> Philadelphia,
> Appellant in No. 13-3853

In Re: Proceedings Before the Court of Common Pleas of
Monroe County, Pa. to Determine Propriety of State
Court Representation by Defender Association of
Philadelphia

> The Defender Association of
> Philadelphia,
> Appellant in No. 13-3854

In Re: Commonwealth's Request for Relief Against or
Directed to Defender Association of Philadelphia

> The Defender Association of
> Philadelphia,
> Appellant in No. 13-3855

In Re:  Proceeding Before The Court of Common Pleas Of Philadelphia To Determine The Propriety of The Defender Association of Philadelphia's Representation of William Johnson In Commonwealth of Pennsylvania v. Johnson

Commonwealth of Pennsylvania,
Appellant in No. 13-4070

In Re: Commonwealth of Pennsylvania's Rule to Show Cause Filed in Commonwealth of Pennsylvania v. William Housman

The Defender Association of Philadelphia,
Appellant in 13-4269

In Re: Commonwealth's Motion to Appoint New Counsel Against or Directed to Defender Association of Philadelphia

Commonwealth of Pennsylvania,
Appellant in No. 13-4325

_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(Civil Action No. 2-13-mc-00062)
District Judge: Hon. Cynthia M. Rufe
(Civil Action No. 2-13-cv-02242)
District Judge: Hon. Berle M. Schiller

On Appeal from the United States District Court for the
Middle District of Pennsylvania
(Civil Action Nos. 1-13-cv-00510; 3-13-cv-00511; 1-13-cv-
00561; 1-13-cv-02103)
District Judge: Hon. A. Richard Caputo
_____

Argued: June 25, 2014

Before: MCKEE, *Chief Judge*, FUENTES, GREENAWAY,
JR., *Circuit Judges*.

(Opinion Filed:  June 12, 2015)


Hugh J. Burns, Jr., Esq. **[ARGUED]**
Thomas W. Dolgenos, Esq.
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107

Jaime M. Keating, Esq.
Cumberland County District Attorney's Office
1 Courthouse Square
Carlisle, PA 17013

Christopher J. Schmidt
Pennsylvania Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120

*Attorneys for Commonwealth of Pennsylvania*

Patrick J. Carome, Esq.
Joshua M. Salzman, Esq.
Paul R.Q. Wolfson, Esq. **[ARGUED]**
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

David Richman, Esq.
Pepper Hamilton LLP
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

*Attorney for Defender Association of Philadelphia*

Lawrence S. Lustberg, Esq.
Benjamin Z. Yaster, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

*Attorneys for Amici-Appellees National Asssociation of Criminal Defense Lawyers, Pennsylvania Association of Criminal Defense Lawyers*

_____

OPINION
_____

FUENTES, *Circuit Judge*:

This case involves a concerted effort by the

Commonwealth of Pennsylvania and various Pennsylvania counties to bar attorneys from the Capital Habeas Unit of the Federal Community Defender Organization for the Eastern District of Pennsylvania ("Federal Community Defender") from representing clients in state post-conviction proceedings. In seven different Post-Conviction Review Act ("PCRA") cases in various Pennsylvania counties, hearings were initiated to disqualify the Federal Community Defender as counsel. In each case, the cited reason for disqualification was based on the organization's alleged misuse of federal grant funds to appear in state proceedings.

The Federal Community Defender removed all of these motions under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), (d)(1). In response, the Commonwealth filed motions under 28 U.S.C. § 1447(c) to return each case to the state court, claiming that the federal officer removal statute did not confer federal subject matter jurisdiction. The Federal Community Defender then filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the Commonwealth lacked a private right of action under federal law, and alternatively that federal law preempted the Commonwealth's motions.

The District Courts split on the jurisdictional question. In three cases, the Eastern District of Pennyslvania denied the Commonwealth's motions to remand and granted the Federal Community Defender's motions to dismiss. In four cases, the Middle District of Pennsylvania granted the motions to remand, and denied as moot the Federal Community Defender's motions to dismiss.

The threshold question before us is whether the Federal Community Defender Organization's invocations of

5

removal jurisdiction were proper. We conclude that they were. On the merits of the Federal Community Defender's motions to dismiss, we conclude that the Commonwealth's attempts to disqualify it as counsel in PCRA proceedings are preempted by federal law. Accordingly, we affirm the judgments of the District Court for the Eastern District of Pennsylvania, and we reverse the judgments of the Middle District and remand with instructions to grant the Federal Community Defender's motions to dismiss.[1]

## I. BACKGROUND

### A. Statutory Framework

The Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, requires each District Court to establish a plan to furnish representation to indigent persons charged with federal crimes. The CJA authorizes the Judicial Conference, the congressionally created policy-making arm of the U.S. Courts, to "issue rules and regulations governing the operation of plans [of representation] formulated under [the CJA]." § 3006A(h). The Judicial Conference has exercised this authority by promulgating a comprehensive regulatory framework for administering the CJA, which it sets out in its *Guide to Judiciary Policy ("Guide")*, Vol. 7, Part A.[2]

---

[1] Isaac Mitchell, the petitioner in the underlying post-conviction proceeding that gave rise to Appeal No. 13-3817, died while the appeal was pending. Accordingly, we have dismissed that appeal as moot by separate order.

[2] *Available at* http://www.uscourts.gov/rules-policies/judiciary-policies/criminal-justice-act-cja-guidelines (last visited May 27, 2015).

Under 18 U.S.C. § 3599(a)(2), the District Court *must* appoint counsel to any indigent inmate, federal or state, pursuing a federal habeas corpus challenge to a death sentence. Further, habeas petitioners facing execution have "enhanced rights of representation" under 18 U.S.C. § 3599, as compared to non-capital defendants and other habeas petitioners. *Martel v. Clair*, 132 S. Ct. 1276, 1284 (2012). This enhanced right of representation includes more experienced counsel, a higher pay rate, and more money for investigative and expert services. *Id.* at 1285. These measures "reflect a determination that quality legal representation is necessary in all capital proceedings to foster fundamental fairness in the imposition of the death penalty." *Id.* (alterations and quotation marks omitted). In some circumstances, a federal court can appoint counsel to represent a federal habeas corpus petitioner in state court for the purpose of exhausting state remedies before pursuing federal habeas relief. *Harbison v. Bell*, 556 U.S. 180, 190 n.7 (2009).

For districts where at least two-hundred people require the appointment of counsel, the CJA allows for the creation of two types of defender organizations. The first is a Federal Public Defender, which is essentially a federal government agency. The second is a Community Defender Organization. *See* § 3006A(g)(2). A Community Defender Organization, while not a federal agency, is defined as a "nonprofit defense counsel service established and administered by any group authorized by the plan to provide representation." § 3006A(g)(2)(B). A Community Defender Organization's bylaws must appear in "the plan of the district or districts in which it will serve," and Congress requires it to "submit to the Judicial Conference of the United States an annual report setting forth its activities and financial position and the

7

anticipated caseload and expenses for the next fiscal year." *Id*.

**B. The Federal Community Defender Organization and the Administrative Office of the United States Courts**

The Federal Community Defender is a Community Defender Organization that represents indigent defendants charged with federal crimes. Its Capital Habeas Unit specially represents inmates sentenced to death in Pennsylvania in federal habeas corpus proceedings.

The Federal Community Defender operates as a distinct sub-unit of the Defender Assocation of Philadelphia. It receives a periodic sustaining grant through § 3006A(g)(2)(B)(ii). This grant is paid "under the supervision of the Director of the Administrative Office of the United States Courts." § 3006A(i). The Administrative Office of the United States Courts ("AO") is an agency within the Judicial Conference. The *Guide*'s grant terms require the AO to audit the Federal Community Defender every year. Unless otherwise authorized by the AO, the Federal Community Defender is prohibited from commingling grant funds with non-grant funds and is required to use grant funds "solely for the purpose of providing representation and appropriate other services in accordance with the CJA." J.A. 334; *see also* J.A. 338-39. If the Federal Community Defender fails to "comply substantially" with the terms of the grant or is "unable to deliver the representation and other services which are the subject of th[e] agreement," the Judicial Conference or the AO "may reduce, suspend, or terminate, or disallow payments under th[e] grant award as it deems appropriate." J.A. at 341.

The U.S. District Court for the Eastern District of Pennsylvania designates the Federal Community Defender to facilitate CJA representation to eligible individuals. The

Middle District of Pennsylvania includes the Federal Community Defender as an organization that may be appointed to represent indigent capital habeas petitioners.[3]

The Federal Community Defender acknowledges that it sometimes appears in PCRA proceedings without a federal court order directing it to do so. It alleges, however, that in such cases it uses federal grant funds only for "preparatory work that [will also be] relevant to a federal habeas corpus petition" and only if it "has received a federal court order appointing it as counsel for federal habeas proceedings or is working to obtain such an appointment." Second Step Br. 10. Otherwise, it uses donated funds. *See id.* at 10-11.

### C. The Genesis of the Disqualification Motions

These disqualification proceedings were spawned by a concurrence written by then-Chief Justice Castille of the Pennsylvania Supreme Court, in a decision denying PCRA relief to a petitioner represented by the Federal Community Defender. Chief Justice Castille criticized the organization's representation of capital inmates in state proceedings and asked pointedly: "is it appropriate, given principles of federalism, for the federal courts to finance abusive litigation in state courts that places such a burden on this Court?" *Commonwealth v. Spotz*, 18 A.3d 244, 334 (Pa. 2011) (Castille, C.J., concurring). Chief Justice Castille answered in the negative, commenting on the "obstructionist" tactics of the Federal Community Defender attorneys and the "perverse[ness]" of the commitment of federal resources to

---

[3] Middle District Plan, § VII, *available at* http://www.pamd.uscourts.gov/sites/default/files/cja_plan.pdf (last visited May 27, 2015).

state post-conviction proceedings. *Id*. at 165.

### D. Procedural History

Seizing on Chief Justice Castille's comments, the District Attorney of Philadelphia filed a "Petition for Exercise of King's Bench Jurisdiction Under 42 Pa. C.S. § 726" directly with the Pennsylvania Supreme Court, requesting that all Federal Community Defender counsel be disqualified from continuing to represent clients in state PCRA proceedings absent an authorization order from a federal court. *In re: Appearance of Federal FCDO in State Criminal Proceedings* (hereinafter *King's Bench Petition*), No. 11-cv-7531, Doc. 1 at 11-42 (E.D. Pa. Dec. 8, 2011).

The Federal Community Defender removed the *King's Bench Petition* to federal court in the U.S. District Court for the Eastern District of Pennyslvania. Its basis for removal was the federal officer removal statute, 28 U.S.C. § 1442(a)(1), (d)(1). Within six days, however, the Commonwealth voluntarily dismissed the action.

The Commonwealth subsequently sought to disqualify Federal Community Defender counsel in individual PCRA proceedings. The Pennsylvania Supreme Court also initiated inquiries into the Federal Community Defender's continued representation of PCRA petitioners. Before us now are seven actions consolidated from the District Courts in the Eastern

and Middle Districts of Pennsylvania.[4] In each case, a federal

---

[4] The District Court judgments we review here are: *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia, Respondent* (hereinafter *Dowling),* 1:13-CV-510, 2013 WL 4458848 (M.D. Pa. Aug. 16, 2013), *reconsideration denied*, 1:13-CV-510, 2013 WL 5781732 (M.D. Pa. Oct. 25, 2013); *In re Proceedings Before the Court of Common Pleas of Monroe Cnty., Pa. to Determine Propriety of State Court Representation by Defender Ass'n of Philadelphia* (hereinafter *Sepulveda*), 3:13-CV-511, 2013 WL 4459005 (M.D. Pa. Aug. 16, 2013), *reconsideration denied*, 3:13-CV-511, 2013 WL 5782383 (M.D. Pa. Oct. 25, 2013); *In re Commonwealth's Request for Relief Against or Directed to Defender Ass'n of Philadelphia, Respondent* (hereinafter *Dick*), 1:13-CV-561, 2013 WL 4458885 (M.D. Pa. Aug. 16, 2013), *reconsideration denied*, 1:13-CV-561, 2013 WL 5781760 (M.D. Pa. Oct. 25, 2013); *In re: Commonwealth of Pennsylvania's Rule to Show Cause* (hereinafter *Housman*), No. 13-cv-2103, Doc. 14 (M.D. Pa. Oct. 25, 2013); *In re Proceeding Before Court of Common Pleas of Philadelphia* (hereinafter *Johnson*), CIV.A. 13-2242, 2013 WL 4774499 (E.D. Pa. Sept. 6, 2013); *In re Commonwealth's Motion to Appoint New Counsel Against or Directed to Defender Ass'n of Philadelphia* (hereinafter *Harris*), MISC.A. 13-62, 2013 WL 4501056 (E.D. Pa. Aug. 22, 2013), *reconsideration denied*, MISC.A. 13-62, 2013 WL 5498152 (E.D. Pa. Oct. 3, 2013). The action mooted by Isaac Mitchell's death is *In re: Proceeding in Which the Commonwealth of Pennsylvania Seeks to Compel the Defender Association of Philadelphia to Produce Testimony and Documents and to Bar it from Continuing to Represent Defendant Mitchell in State Court* (hereinafter *Mitchell*), 13-CV-1871, 2013 WL 4193960 (E.D.

11

court assigned the Federal Community Defender to represent these clients in federal habeas corpus proceedings, but not in state PCRA proceedings. Like the *King's Bench Petition*, the main thrust of these motions, as well as the Pennsylvania Supreme Court's orders, is that Federal Community Defender attorneys should be removed from the underlying PCRA cases because they are misusing federal funds by representing clients in state proceedings without an authorization order from a federal court. A summary of the allegations in these disqualification motions follows.

In *Mitchell*, the District Attorney of Philadelphia filed a "Motion to Remov[e] Federal Counsel" in the Pennsylvania Supreme Court. J.A. at 309-16. The DA alleged that (1) "the presence of federally-funded [Federal Community Defender] lawyers in this case [wa]s unlawful [under 18 U.S.C. § 3599], as there has been no order from a federal court specifically authorizing them to appear in state court," J.A. at 310, and (2) it was "a violation of the sovereignty of the Commonwealth of Pennsylvania for lawyers funded by a federal government agency for the purpose of appearing in federal courts to instead appear in the state's criminal courts," J.A. at 312-13.

In a per curiam order, the Pennsylvania Supreme Court found that the Commonwealth's allegations were potentially meritorious:

> [T]he matter is **REMANDED** to the PCRA court to determine whether current counsel, the . . . [Federal Community Defender] . . . may represent appellant [Mitchell] in this state capital PCRA proceeding, or whether other appropriate post-conviction counsel should be

Pa. Aug. 15, 2013).

appointed. In this regard, the PCRA court must first determine whether the [Federal Community Defender] *used any federal grant monies to support its activities in state court in this case*. If the [Federal Community Defender] cannot demonstrate that *its actions here were all privately financed*, and convincingly attest that this will remain the case going forward, it is to be removed.

J.A. at 275 (emphasis added).[5]

The Supreme Court's remand order in *Mitchell* was the genesis of similar proceedings in the remaining PCRA cases that are on review here. In *Housman*, the District Attorney of Cumberland County filed an almost identical motion as the DA in *Mitchell*. J.A. at 713-20. The DA in *Housman* contended that, "[w]hen a PCRA court finds that [Federal Community Defender] attorneys use federal funding in a state proceeding, they must remove the [Federal Community Defender] attorneys from the case." J.A. at 718. The Attorney General of Pennsylvania filed motions in three other cases, *Harris*, *Dowling*, and *Dick*. J.A. at 456, 502; *In re: Commonwealth's Request for Relief Against or Directed to Defender Association of Philadelphia*, No. 13-cv-561, Doc. 10-4 at 8 (M.D. Pa., March 28, 2013).

---

[5] This order provoked a dissent from two of the justices, on the basis that the legal issues "require the construction of federal statutes and other authority, consideration of the relationship between federal and state court systems in capital litigation, and consideration of counsel's role therein." J.A. at 278.

In *Johnson* and *Sepulveda*, the Pennsylvania Supreme Court issued sua sponte orders to the PCRA trial courts. In *Johnson*, the Supreme Court required that the Federal Community Defender "produce a copy of any federal appointment order it may have secured in this matter, within ten (10) days of the issuance of this Order." J.A. at 392. In *Sepulveda*, the order was more detailed:

> If federal funds were used to litigate the PCRA below—*and the number of [Federal Community Defender] lawyers and witnesses involved, and the extent of the pleadings, suggest the undertaking was managed with federal funds—the participation of the [Federal Community Defender] in the case may well be unauthorized by federal court order or federal law*. Accordingly, on remand, the PCRA court is directed to determine whether to formally appoint appropriate post-conviction counsel and to consider whether the [Federal Community Defender] may or should lawfully represent appellant in this state capital PCRA proceeding.

*Commonwealth v. Sepulveda*, 55 A.3d 1108, 1151 (Pa. 2012) (emphasis added).

The Federal Community Defender removed these seven proceedings, producing seven separate federal civil actions, four in the Middle District of Pennsylvania, and three in the Eastern District of Pennsylvania.[6] The Commonwealth responded to each removal petition with a motion to remand,

---

[6] Although the disqualification proceedings were removed to federal court, the underlying PCRA actions remained in state court.

14

claiming that federal jurisdiction was improper. The Federal Community Defender simultaneously filed a motion to dismiss on the merits under Federal Rule of Civil Procedure 12(b)(6). The District Courts split: judges in the Eastern District found there was federal jurisdiction and granted the Federal Community Defender's motions to dismiss on the merits. A judge deciding four of these actions in the Middle District granted the Commonwealth's motions to remand and denied as moot the Federal Community Defender's motions to dismiss. Each party appeals the adverse rulings against it.

## II. REMOVAL JURISDICTION

The first issue in this case is whether federal courts have jurisdiction over the Commonwealth's disqualification motions. We have jurisdiction over these appeals under 28 U.S.C. § 1291; *see also* 28 U.S.C. § 1447(d). We review de novo whether the District Court had subject matter jurisdiction. *Bryan v. Erie Cnty. Office of Children & Youth*, 752 F.3d 316, 321 n.1 (3d Cir. 2014). A defendant seeking removal must provide a "notice of removal . . . containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446. This notice "must allege the underlying facts supporting each of the requirements for removal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). Because the Commonwealth facially attacks jurisidiction, we construe the facts in the removal notice in the light most favorable to the Federal Community Defender. *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

The Federal Community Defender proposes that federal courts have mandatory jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), (d)(1). For

the following reasons, we agree.

### A. Statutory Framework

The federal officer removal statute has existed in some form since 1815. *Willingham v. Morgan*, 395 U.S. 402 (1969). The Statute's "basic purpose" is:

> [T]o protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority.

*Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007) (alterations and internal quotation marks omitted).

The federal officer removal statute's current form, § 1442, is the result of many amendments that broadened a 1948 codification of the statute. *Willingham*, 395 U.S. at 406. Following its most recent amendment in 2011, the statute provides, in relevant part:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency

16

thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

. . .

(d) In this section, the following definitions apply:

(1) The terms "civil action" and "criminal prosecution" include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued. If removal is sought for a proceeding described in the previous sentence, and there is no other basis for removal, only that proceeding may be removed to the district court.

28 U.S.C. § 1442(a)(1), (d)(1).

"Section 1442(a) is an exception to the well-pleaded complaint rule, under which (absent diversity) a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law." *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n.12 (2006) (internal quotation marks omitted). Under this statute, a colorable federal defense is sufficient to confer federal jurisdiction. *See id*. Unlike the general removal statute, the federal officer removal statute is to be "broadly construed" in favor of a federal forum. *See Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994).

17

The Removal Clarification Act of 2011, Pub. L. 112-51, 125 Stat. 545 (2011), made two amendments to § 1442 that are relevant here. First, the Act clarified that the term "civil action" includes ancillary proceedings, so long as a "judicial order" is sought or issued. *Id*. at 545; *see* § 1442(d)(1). Second, it added the words "or relating to" after "for" in § 1442(a). 125 Stat. 545. The House Committee on the Judiciary wrote that the changes to the statute were meant "to ensure that any individual drawn into a State legal proceeding based on that individual's status as a Federal officer has the right to remove the proceeding to a U.S. district court for adjudication." H.R. Rep. No. 112-17, pt. 1 (2011), as reprinted in 2011 U.S.C.C.A.N. 420, 420. Furthermore, adding the "or relating to" language is "intended to broaden the universe of acts that enable Federal officers to remove to Federal court." *Id*. at 425.

## B. Preliminary Considerations

As a preliminary matter, we must address a couple of arguments raised by the Commonwealth. We note that the proceedings are "civil actions" as defined by § 1442(a)(1), (d)(1): they are ancillary proceedings in which a judicial order was sought or, in the cases of *Mitchell*, *Johnson*, and *Sepulveda*, issued. Contrary to the Commonwealth's related assertion, attorney disciplinary proceedings are not categorically exempt from removal under § 1442. *See Kolibash v. Comm. on Legal Ethics of W. V. Bar*, 872 F.2d 571, 576 (4th Cir. 1989) (allowing for attorney disciplinary proceedings in front of the Committee on Legal Ethics of West Virginia to be removed because the "state investigative body operate[d] in an adjudicatory manner"). In any event, the disqualification motions in this case are not attorney

18

disciplinary proceedings. *See Commonwealth v. Spotz*, No. 576 CAP, 2011 Pa. LEXIS 2368, at *6 (Pa. Oct. 3, 2011) (Baer, J., dissenting) (contending that "unethical practices engaged in by the [Federal Community Defender] attorneys should be resolved by referral to the Disciplinary Board").

### C. Elements for Removal

In order for the Federal Community Defender to properly remove under § 1442, it must meet four requirements. The Federal Community Defender must show that (1) it is a "person" within the meaning of the statute; (2) the Commonwealth's claims are based upon the Federal Community Defender's conduct "acting under" the United States, its agencies, or its officers; (3) the Commonwealth's claims against it are "for, or relating to" an act under color of federal office; and (4) it raises a colorable federal defense to the Commonwealth's claims. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180-81 (7th Cir. 2012); *accord Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998).

### D. Application of the Elements for Removal

We address each of the four elements in turn.

### 1. The Federal Community Defender is a "person"

The Federal Community Defender is a "person" within the meaning of §1442(a)(1). Because the statute does not define "person," we look to 1 U.S.C. § 1, which defines the term to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; *see also Ruppel*, 701 F.3d at 1181. As a non-profit corporation, the Defender Association of

Phildelphia falls within this definition. Furthermore, as the Second Circuit has recognized, "the legislative history is devoid of evidence suggesting that Congress intended § 1442 not apply to corporate persons," and "§ 1442 also lists other non-natural entities, such as the United States and its agencies, which suggests that interpreting 'person' to include corporations is consistent with the statutory scheme." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135-36 (2d Cir. 2008). Consequently, we find that the Defender Association—the umbrella organization and therefore the named party in this case—satisfies the first requirement for removal.

### 2. The Federal Community Defender was "acting under" a federal officer or agency

The Federal Community Defender satisfies the next element because the injuries the Commonwealth complains of are based on the Federal Community Defender's conduct while it was "acting under" the AO. *See Feidt*, 153 F.3d at 127.

The words "acting under" describe "the triggering relationship between a private entity and a federal officer." *Watson*, 551 U.S. at 149. The Supreme Court has stated that "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* at 151 (quoting 18 Oxford English Dictionary 948 (2d ed. 1989)).

Furthermore, "precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist,* or to help *carry out,* the duties or tasks of the

20

federal superior." *Id.* at 152. The Court has stressed that "[t]he words 'acting under' are broad, and . . . that the statute must be 'liberally construed.'" *Id.* at 147 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

While the Court has not precisely determined "whether and when particular circumstances may enable private contractors to invoke the statute," *id.* at 154, it has noted with approval that "lower courts have held that Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* at 153. The Supreme Court cited by way of example *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-400 (5th Cir. 1998), in which the Fifth Circuit determined that Dow Chemical was "acting under" color of federal office when it manufactured Agent Orange for use in helping to conduct a war pursuant to a contractual agreement with the United States.

The *Watson* Court explained that in *Winters* and other similar cases, the private contractor acted under a federal officer or agency because the contractors "help[ed] the Government to produce an item that it need[ed]." 551 U.S. at 153. This is because, the "assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Id.* For example, in *Winters*, "Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153-54.

21

The Court contrasted government contractors with other private parties lacking a contractual relationship with the government. *See id*. It concluded that "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself [bring a party] within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id*. at 153. The factual scenario in *Watson* itself is illustrative. In that case, Phillip Morris could not remove a deceptive and unfair business practices suit filed against it based merely on a defense that it complied with Federal Trade Commission regulations governing its advertising. *Id*. at 156. The Court explained that Congress could not have meant for the statute to sweep so broadly, for if mere compliance with federal law were sufficient, then the meaning of "acting under" could include taxpayers who complete federal tax forms; airline passengers who obey prohibitions on smoking; or federal prisoners who follow the rules and regulations governing their conduct. *Id*. at 152. These types of relationships do not warrant removal because state court prejudice would not be expected. *See id*.

We adopt the principles outlined in *Watson* to guide our understanding of whether the Federal Community Defender was "acting under" a federal agency. *Cf. Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1231 (8th Cir. 2012) (relying on same); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1086-87 (6th Cir. 2010) (same). The relationship between the Federal Community Defender and the federal government is a sufficiently close one to conclude that the Federal Community Defender was "acting under" a federal agency— the Judicial Conference and its subordinate, the AO—at the time of the complained-of conduct.

The Federal Community Defender is a non-profit entity created through the Criminal Justice Act that is delegated the authority to provide representation under the CJA and § 3599. Its "stated purposes must include implementation of the aims and purposes of the CJA." *Guide*, Vol. 7A, Ch. 4, § 420.20(a). It also must adopt bylaws consistent with representation under the CJA and a model code of conduct similar to those governing Federal Public Defender Organizations. *See* § 420.20(a) & (c). Through this relationship, the Federal Community Defender "assists" and helps the AO to "*carry ou*t[] the duties or tasks of a federal superior," which is to implement the CJA and § 3599 through the provision of counsel to federal defendants and indigent federal habeas corpus petitioners. *See Watson*, 551 U.S. at 152. Unlike the companies in *Watson*, the Federal Community Defender provides a service the federal government would itself otherwise have to provide. *See id.* at 154; *Isaacson*, 517 F.3d at 137 ("Unlike the tobacco companies in *Watson,* Defendants received delegated authority; they were not simply regulated by federal law.").

Additionally, the nature of the Commonwealth's complaints pertains to the "triggering relationship" between the Federal Community Defender and the AO, because the Commonwealth targets the manner in which the Federal Community Defender uses its federal money, not another aspect of its representation of clients in state court. *See Watson*, 551 U.S. at 149. As a condition of receiving federal grant money, the Federal Community Defender must maintain detailed financial records, submit an annual report of activities and expected caseload, and return unexpended balances to the AO. Additionally, the Federal Community Defender is prohibited from commingling CJA funds with its other funds. And "[u]nless otherwise authorized by the AO,

no employee of a grantee organization (including the federal defender) may engage in the practice of law outside the scope of his or her official duties with the grantee." J.A. at 340. The scope of when the Federal Community Defender acts under the AO, whatever its limits, surely extends to whether it sufficiently complies with its obligations under its grant, specifically whether it is engaged in the unauthorized practice of law, or is commingling funds in violation of the AO's directives.

The Commonwealth disagrees, contending that the Federal Community Defender must show not only that it "act[ed] under" color of federal office at the time of the complained-of conduct, but also that the Federal Community Defender acted pursuant to a *federal duty* in engaging in the complained-of conduct. The Commonwealth argues that because the Federal Community Defender cannot state a duty to appear in PCRA proceedings on behalf of its clients, it cannot be "acting under" a federal agency when it does so. Framing the inquiry in this manner essentially collapses the "acting under" inquiry into the requirement that the complained-of conduct be "for, or relating to," an act under color of federal office. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124-25 (2d Cir. 2007). Even if we were to address these requirements simultaneously, whatever causation inquiry we import could not be narrower than the one Congress has written into the statute. As discussed below, we disagree that the Federal Community Defender is required to allege that the complained-of conduct *itself* was at the behest of a federal agency. It is sufficient for the "acting under" inquiry that the allegations are directed at the relationship between the Federal Community Defender and the AO.

24

Given these considerations, we conclude that the Federal Community Defender satisfies this requirement.

**3. The Commonwealth's claims concern acts "for or relating to" an act under color of federal office**

We conclude that the Federal Community Defender satisfies the causation element because the Commonwealth's claims concern acts "for or relating to" the Federal Community Defender's federal office.

Prior to 2011, the proponent of jurisdiction was required to show that it has been sued "*for* any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (2010) (emphasis added).[7] In other words, the proponent was required to "show a nexus, a causal connection between the charged conduct and asserted official authority." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (quotation marks omitted).

For example, in *Maryland v. Soper (No. 2)*, 270 U.S. 36 (1926), the Supreme Court decided that four prohibition agents and their chauffeur could not take advantage of the federal officer removal statute for their state prosecutions for lying under oath to a coroner. According to the agents, what required them to testify in front of the coroner was their discovery of a man who was wounded, and who eventually died, on their way back from investigating an illegal alcohol still. Thus, they claimed that their federal duties were a cause of their allegedly perjurous testimony. *Id.* at 41. The Court

---

[7] Both before and after the 2011 amendments, however, the statute also permitted the removal of actions brought "on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." 28 U.S.C. § 1442(a)(1).

determined that this connection was insufficient to justify removal because testifying before the coroner was not part of the agents' official duties, and those were the acts that the State relied on for prosecution. *Id.* at 42. The Court acknowledged, however, that the acts need not be "expressly authorized" by a federal statute, so long as the acts complained of are "an inevitable outgrowth of" and "closely interrelated" with the officer's federal duty. *Id.*

By contrast, the Court found a sufficient causal connection for removal jurisdiction in *Acker*, 527 U.S. 423. There, two federal district court judges resisted payment of a county's occupational tax,[8] claiming that it violated the "intergovernmental tax immunity doctrine." *Id.* at 429. After the State brought a collection action against the judges in state small claims court, the judges removed under § 1442 and asserted that the small claims suits were "*for* a[n] act under color of office." *Id.* at 432. The judges argued that there was a sufficient causal relationship because the ordinance at issue made it unlawful to engage in their federal occupation without paying the tax. *Id.* For its part, the State argued that the tax was levied against the judges personally, and not on them as judges, so the collection suit was unrelated to their federal office. *Id.* The Court decided that "[t]o choose between those readings of the Ordinance is to decide the merits of this case," which it would not do at this stage. *Id.*; *see also id.* at 431 ("We . . . do not require the officer virtually to win his case before he can have it removed.") (quotation marks omitted). The Court concluded that the

---

[8] Defined as "[a]n excise tax imposed for the privilege of carrying on a business, trade, or profession." *TAX*, Black's Law Dictionary (9th ed. 2009).

26

judges had made an adequate threshold showing at this stage to grant federal courts jurisdiction under § 1442 because "[t]he circumstances that gave rise to the tax liability, not just the taxpayers' refusal to pay, 'constitute the basis' for the tax collection lawsuits at issue." *Id.* at 433. The tax suits arose out of the judges' "holding court in the county and receiving income for that activity" and therefore had a sufficient nexus to the judges' official duties. *Id.*

Thus, before 2011, proponents of removal jurisdiction under § 1442 were required to "demonstrate that the acts for which they [we]re being sued" occurred at least in part "*because of* what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137. In 2011, however, the statute was amended to encompass suits "for *or relating to* any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (2011) (emphasis added). Neither the Supreme Court nor any federal appellate court has addressed the significance of the insertion of the words "or relating to" in the statute. However, the Supreme Court has defined the same words in the context of another statute: "The ordinary meaning of the[] words ['relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 & n.16 (1983) (same). Thus, we find that it is sufficient for there to be a "connection" or "association" between the act in question and the federal office. Our understanding comports with the legislative history of the amendment to § 1442(a)(1), which shows that the addition of the words "or relating to" was intended to "broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. Rep. No. 112-17,

27

pt. 1 (2011), as reprinted in 2011 U.S.C.C.A.N. 420, 425.

In this case, the acts complained of undoubtedly "relate to" acts taken under color of federal office. First, the Federal Community Defender attorneys' employment with the Federal Community Defender is the very basis of the Commonwealth's decision to wage these disqualification proceedings against them. The Commonwealth has filed these motions to litigate whether the Federal Community Defender is violating the federal authority granted to it. As the Supreme Court has noted, whether a federal officer defendant has completely stepped outside of the boundaries of its office is for a federal court, not a state court, to answer. *See Acker*, 527 U.S. at 431-32; *Willingham,* 395 U.S. at 409 ("If the question raised is whether they were engaged in some kind of 'frolic of their own' in relation to respondent, then they should have the opportunity to present their version of the facts to a federal, not a state, court.").

Moreover, the Federal Community Defender's representation of state prisoners in PCRA proceedings is closely related to its duty to provide effective federal habeas representation. As the Supreme Court has emphasized on numerous occasions, the Antiterrorism and Effective Death Penalty Act of 1996 significantly increased the extent to which federal habeas relief is contingent on the preservation and effective litigation of claims of error in state court, including state post-conviction proceedings:

> Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court. 28 U.S.C. § 2254(b). If the state court rejects the claim on procedural grounds, the claim is

28

> barred in federal court unless one of the exceptions to the doctrine of *Wainwright v. Sykes,* 433 U.S. 72, 82-84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), applies. And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2) applies. Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding, see *id.,* at 90, 97 S.Ct. 2497.

*Harrington v. Richter*, 562 U.S. 86, 103 (2011). As a result, counsel in PCRA proceedings must be careful to comply with state procedural rules, file within applicable limitations periods, and fully exhaust their clients' claims in order to secure meaningful habeas review in federal court. The impact PCRA litigation can have on a subsequent federal habeas petition is, of course, one of the reasons the Federal Community Defender represents prisoners in such litigation. This impact is significant enough to convince us that the Federal Community Defender's actions in PCRA litigation "relate to" its federal duties for purposes of removal jurisdiction.

### 4. The Federal Community Defender raises colorable defenses

The final element for removal requires the Federal Community Defender to raise a "colorable federal defense" to the Commonwealth's claims. *Acker*, 527 U.S. at 431-32. Since at least 1880, the Supreme Court has required that

federal officer removal be allowed if, and only if, "it appears that a Federal question or a claim to a Federal right is raised in the case, and must be decided therein." *Mesa v. California*, 489 U.S. 121, 126-27 (1989) (quoting *Tennessee v. Davis*, 100 U.S. 257, 262 (1880)) (quotation marks and emphasis omitted). This requirement assures that federal courts have Article III jurisdiction over federal officer removal cases. *Mesa*, 489 U.S. at 136.[9]

The Commonwealth contends that the federal defense must coincide with an asserted federal duty. Not so. In *Acker*, for example, the Supreme Court concluded that the defendant-judges' defense—that they enjoyed "intergovernmental tax immunity"—brought them within the removal statute, notwithstanding the fact that the judges' duties did not require them to resist the tax. *See* 527 U.S. at 437. What matters is that a defense raises a federal question, not that a federal duty forms the defense. True, many removal cases involve defenses based on a federal duty to act, or the lack of such a duty. *See Mesa*, 489 U.S. at 126-34. But the fact that duty-based defenses are the most common defenses does not make them the only permissible ones.

---

[9] We note that, in this case, because the motions for disqualification have as an element a nested federal question that is both "disputed" and "substantial," Article III "arising under" jurisdiction likely exists even without the assertion of a federal defense. *Cf. Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Mesa*, 489 U.S. at 129 (describing a federal officer removal case where the plaintiff "could have brought suit in federal court based on 'arising under' jurisdiction" because the plaintiff claimed that a federal officer had failed to a comply with a federal duty).

The Federal Community Defender raises three colorable defenses. First, the Federal Community Defender claims that it was not violating the terms of § 3599 when it appeared in state court because it used non-federal funds when necessary. Second, it argues that the Commonwealth's attempts to disqualify it on the alleged basis that it was misusing federal grant money is preempted by federal law. Third, it argues that the Commonwealth lacks a cause of action to enforce the terms of the Federal Community Defender's grant with the AO under the CJA, § 3599, or otherwise. Each of these three defenses is analogous to a defense the Supreme Court has allowed to trigger removability.

The Federal Community Defender's first defense is a "colorable federal defense" akin to the one raised in *Cleveland, C., C. & I.R. Co. v. McClung*, 119 U.S. 454 (1886). In *McClung*, a railroad company sued a U.S. Customs collector, McClung, in state court for recovery of a lien. The company alleged that McClung had a duty under federal law to notify the railroad company before delivering merchandise to the consignees, even where the consignees had paid the lien over to the collector. *Id.* at 454-56. McClung argued that he had no duty to notify the railroad company under federal law, which allowed him to remove. *Id.* at 462. In a later case interpreting *McClung*, the Supreme Court explained that "[t]o assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits." *Mesa*, 489 U.S. at 130. In both cases, the defenses "are equally defensive and equally based in federal law." *Id.*

31

The defense raised by the Federal Community Defender is analogous to the defense raised in *McClung*. The Commonwealth claims that the Federal Community Defender has violated 18 U.S.C. § 3599 and the grant terms in its contract with the AO, which implements the statute. The Federal Community Defender responds that it has violated neither set of requirements. Whether this is true is a determination to be made by a federal court. We find this to be a federal defense in that it requires interpretation of federal statutes, the CJA and § 3599, as well as the *Guide*, which the Judicial Conference promulgated to effectuate these statutes.

Contrary to the Commonwealth's argument, this defense is not foreclosed by the Supreme Court's interpretation of the boundaries of § 3599. *See Harbison*, 556 U.S. at 180. *Harbison* examined whether state clemency proceedings were proceedings "subsequent" to federal habeas for purposes of 18 U.S.C. § 3599(e). If they were, § 3599(e) would require the district court to appoint an attorney, already appointed for purposes of seeking federal habeas relief, to represent the petitioner in those proceedings as well. The Court determined that state clemency proceedings were "subsequent" and that appointment of counsel was authorized. *Id.* at 182-83. The Court contrasted state clemency with state post-conviction relief, stating that "[s]tate habeas is not a stage 'subsequent' to federal habeas. Just the opposite: Petitioners must exhaust their claims in state court before seeking federal habeas relief. See § 2254(b)(1)." *Harbison*, 556 U.S. at 189. Thus, absent an authorization order from a federal district court requiring exhaustion of state remedies, federally funded counsel would not be *required* in such situations. *Id*. at 190 n.7. The Court never stated, however, that Federal Community Defender counsel

would be *prohibited* from representing clients in state habeas proceedings in preparation for federal habeas corpus representation. *See id.* Indeed, that is the question squarely presented by the merits of this case. Because we must accept the Federal Community Defender's theory of the case at this juncture, *see Acker*, 527 U.S. at 432, we find this defense to be colorable.

Next, the Federal Community Defender claims that the Commonwealth is impermissibly attempting to interfere in the relationship between the Federal Community Defender and the AO under the preemption principles laid out in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001). This federal defense is similar to the one raised by the judges in *Acker*, which was that Jefferson County's tax "risk[ed] interfering with the operation of the federal judiciary in violation of the intergovernmental tax immunity doctrine." 527 U.S. at 431 (alterations in original and quotation marks omitted). This, too, is a "colorable" defense that the Federal Community Defender can raise in federal court: it is plausible that the Congress intended for no one other than the Judicial Conference and the AO to monitor and enforce a Community Defender Organization's compliance with its grant terms.

Finally, the Federal Community Defender raises the defense that the Commonwealth lacks a private right of action to enforce § 3599 and the terms of the Federal Community Defender's grant with the AO. Similar to the preemption defense, the lack of a right of action in the Commonwealth is premised on the idea that Congress has delegated authority only to the Judicial Conference and the AO to monitor and enforce the CJA and § 3599. Thus, the Commonwealth's attempt to enforce these statutory provisions would interfere

with Congress's intended mechanism for gaining compliance with the CJA and § 3599.

The Federal Community Defender therefore satisfies all of the requirements of § 1442(a)(1), and the disqualification proceedings were properly removed.[10]

## III. THE MERITS OF THE FEDERAL COMMUNITY DEFENDER'S MOTIONS TO DISMISS

Satisfied that we have proper jurisdiction over these consolidated appeals under the federal officer removal statute, 28 U.S.C. § 1442(a), we now turn to the merits of the Federal Community Defender's motions to dismiss under Rule

---

[10] In its Third Step Brief, the Commonwealth argues for the first time that, even if the federal courts have jurisdiction over these proceedings, we should decline to exercise it under the *Younger* abstention doctrine. Because the Commonwealth failed to raise this issue in its First Step Brief, it has waived the argument. *Winston v. Children & Youth Servs.*, 948 F.2d 1380, 1384 (3d Cir. 1991). Furthermore, we decline to exercise our discretion to look past the waiver because the abstention argument lacks merit. The Commonwealth has pointed us to no courts that have exercised *Younger* abstention where the federal officer removal statute grants jurisdiction. In fact, the courts we are aware of, that have addressed the argument, have found such an exercise of abstention to be inappropriate. *See, e.g.*, *Jamison v. Wiley*, 14 F.3d 222, 239 (4th Cir. 1994) ("[T]he removal jurisdiction granted by § 1442(a), which is designed to protect federal employees against local prejudice, is mandatory, not discretionary, and a district court has no authority to abstain from the exercise of that jurisdiction on any ground other than the two specified in 1447(c).").

12(b)(6). To summarize, the Federal Community Defender's motions argue, in relevant part, that the Commonwealth lacks a private right of action to enforce the CJA and § 3599, and, alternatively, that the disqualification motions are preempted by federal law.

As for the right of action argument, the Commonwealth concedes that it lacks a right of action under the CJA or § 3599. And without a private right of action, the Commonwealth may not claim a direct violation of federal law. *See Wisniewski v. Rodale, Inc.,* 510 F.3d 294, 296-97 (3d Cir. 2007); *see also State of N.J., Dep't of Envtl. Prot. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 421 n.34 (3d Cir. 1994) (noting that a State also needs a right of action to enforce a federal law).

Rather, the Commonwealth argues that its disqualification motions rest on state law. The named source of state authority is Article V, § 10(c) of the Pennsylvania constitution, which allows the Pennsylvania Supreme Court to "prescribe general rules governing practice, procedure and the conduct of all courts." Accordingly, we look to the Pennsylvania Supreme Court Orders issued for the substance of the rule in this case. Those Orders provide that if the Federal Community Defender fails to show that its actions representing its clients are entirely "privately financed" with non-federal funds, the state PCRA court is to disqualify the Federal Community Defender as counsel. J.A. at 275 (Remand Order in *Mitchell*); *see also Sepulveda*, 55 A.3d at 1151 (sua sponte Order); J.A. at 392 (sua sponte Order in *Johnson*).

It is unclear whether these Orders were in fact issued pursuant to Article V, § 10(c) of the Pennsylvania

constitution. The Pennsylvania Supreme Court undoubtedly has the power to enforce its rules of conduct. But the Orders here are concerned with the unauthorized use of federal funds and cite no generally applicable rule governing the practice of law in Pennsylvania courts. Whether the Pennsylvania Supreme Court relied on its § 10(c) authority is a question of state law, and if that Court were to speak on the question, we would be bound by its determination. We may sidestep this issue, however, as the Federal Community Defender prevails regardless of the answer. As explained above, the disqualification proceedings may not enforce the federal statutes at issue here. If, on the other hand, the disqualification proceedings are based on state law, they conflict with federal law and are therefore preempted.

The doctrine of conflict preemption "embraces two distinct situations." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 905 (2014). The first is "where it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). This type of conflict preemption is not present here, because it would be possible for the Federal Community Defender to comply with both federal law and the state rule alleged by the Commonwealth by withdrawing as counsel in these cases. The second type of conflict preemption arises "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373 (alterations and internal quotation marks omitted). This is the type of conflict preemption that the Federal Community Defender presses.

The Supreme Court has instructed that, "particularly in

36

those [cases] in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations and internal quotation marks omitted); *see also Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 248 (3d Cir. 2008) (explaining that, "because the States are independent sovereigns . . . we have long presumed that Congress does not cavalierly pre-empt state-law causes of action" (citation omitted)). This presumption does not apply, however, when Congress legislates in an area of uniquely federal concern. *See Buckman*, 531 U.S. at 347.

The presumption against preemption does not apply here. As a general matter, it is true that the States have a long history of regulating the conduct of lawyers, who are officers of the courts. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 361-62 (1977). But the impetus for the proceedings here is that the Federal Community Defender is allegedly applying its federal grant funds to purposes not authorized by the relevant federal statutes and grant terms. *See, e.g.*, *Sepulveda*, 55 A.3d at 1151; J.A. at 275. As explained above, these grants are paid under the supervision of the AO, a federal agency within the Judicial Conference with regulatory control over the Federal Community Defender. "[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347. Policing such relationships "is hardly a field which the States have traditionally occupied," and thus there can be no presumption against preemption here. *Id.* (citation and internal quotation

marks omitted).

In light of this determination, we find that the disqualification proceedings are preempted. The overarching purpose of the federal statutory provisions at issue here is to provide "quality legal representation . . . in all capital proceedings to foster fundamental fairness in the imposition of the death penalty." *Martel*, 132 S. Ct. at 1285 (internal quotation marks omitted). To achieve this objective, Congress has authorized grants to Community Defender Organizations and tasked the AO with supervising grant payments. The disqualification proceedings, however, seek to supplant the AO by allowing the Commonwealth's courts to determine whether a Community Defender Organization has complied with the terms of its federal grants and to attach consequences to noncompliance.

Significantly, the disqualification proceedings are preempted whether or not federal law authorizes the Federal Community Defender to use grant funds for certain purposes in PCRA cases. If the Federal Community Defender is authorized to use grant funds, the Commonwealth plainly cannot disqualify it for doing so without undermining congressional objectives. But even if the Federal Community Defender is not authorized to use grant funds, the disqualification proceedings interfere with the regulatory scheme that Congress has created.

As the Supreme Court has observed, "'[c]onflict is imminent whenever two separate remedies are brought to bear on the same activity.'" *Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012) (quoting *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986)). "Sanctions are drawn not only to bar what they

prohibit but to allow what they permit, and the inconsistency of sanctions [may] undermine[] the congressional calibration of force." *Crosby*, 530 U.S. at 380 (2000). This is especially so when a federal agency is afforded the discretion to apply those sanctions or stay its hand. *See Buckman*, 531 U.S. at 349-51; *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) (noting that "regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption").

Here, Congress has delegated supervisory authority over CJA grants to the AO. The AO has the power to "reduce, suspend, or terminate, or disallow payments . . . as it deems appropriate" if the Federal Community Defender does not comply with the terms of its grants. J.A. at 341. But if the Commonwealth could sanction noncompliance, the AO could be hindered in its ability to craft an appropriate response. For example, the AO might be inhibited from exercising its authority to reduce payments if it knew that the Commonwealth might disqualify the Federal Community Defender from representing indigent capital defendants as a result. After all, as the District Court noted in *Mitchell*, "the [AO's] usual remedies, such as recoupment of distributed funds, are more consistent with the CJA's objectives because they mitigate the disruption to the existing attorney-client relationships." 2013 WL 4193960, at *19. Allowing the Commonwealth to attach consequences to the Federal Community Defender's relationship with the AO would "exert an extraneous pull on the scheme established by Congress" in a manner that conflicts with federal objectives. *Buckman*, 531 U.S. at 353.

Consequently, we hold that the disqualification

39

proceedings brought against the Federal Community Defender are preempted and must be dismissed.

IV. CONCLUSION

The federal officer removal statute provides removal jurisdiction for federal courts to decide the motions to disqualify filed in the Commonwealth's PCRA proceedings. Those disqualification proceedings are preempted by federal law. We will therefore affirm the judgments of the Eastern District of Pennsylvania and reverse the Middle District's judgments, remanding to the Middle District with instructions that the Federal Community Defender's motions to dismiss be granted.[11]

---

[11] We also wish to express our agreement with the sentiments expressed in the concurrence, which further discusses the context of this dispute.

McKEE, Chief Judge, concurring

I agree with the Majority's conclusions that this action was properly removed under the federal officer removal statute, 28 U.S.C. §§1442(a)(1), (d)(1) (2012), and that any state law cause of action is preempted. I therefore join the Majority Opinion in its entirety. Nevertheless, I feel compelled to write separately to amplify the context of this dispute and to stress that the Commonwealth is not actually proceeding on a state law theory at all, despite its claims to the contrary.

## I.    Context

Although it does not alter our legal analysis of the issues before us, it is difficult not to wonder why the Commonwealth is attempting to bar concededly qualified defense attorneys from representing condemned indigent petitioners in state court. A victory by the Commonwealth in this suit would not resolve the legal claims of these capital habeas petitioners. Rather, it would merely mean that various cash-strapped communities would have to shoulder the cost of paying private defense counsel to represent these same petitioners, or that local pro bono attorneys would have to take on an additional burden. And it would surely further delay the ultimate resolution of the petitioners' underlying claims.

Pennsylvania law instructs that, after the conclusion of a death-sentenced prisoner's direct appeal, "the trial judge shall appoint new counsel for the purpose of post-conviction collateral review, unless . . . [among other things] the defendant has engaged counsel who has entered, or will promptly enter, an appearance for the collateral review proceedings." Pa. R. Crim. P. 904(H)(1)(c). Death-sentenced petitioners are thus entitled to counsel during PCRA proceedings, and they may be represented by their counsel of choice. *Id.* In the cases consolidated for this appeal, the Federal Community Defender asserts that its attorneys, members of the Pennsylvania bar, are functioning in that capacity—counsel of choice for their condemned clients. The Commonwealth does not challenge that representation.

1

As my colleagues in the Majority note, the genesis of these disqualification motions was a concurring opinion by then-Chief Justice Castille in *Commonwealth v. Spotz*, 18 A.3d 244 (Pa. 2011) (Castille, C.J., concurring).[1] Maj. Op. 7-8. The opinion severely criticized the tactics, motives, integrity, and even the veracity of Federal Community Defender attorneys who had intervened in state court PCRA proceedings on behalf of a condemned prisoner. It is rife with harsh critiques of the Federal Community Defender. *See Spotz*, 18 A.3d at 334 (Castille, C.J., concurring) ("There is no legitimate, ethical, good faith basis for [their] obstreperous briefing.").[2] Chief Justice Castille lamented in his concurring opinion in *Spotz* that the Federal Community Defender's "commitment of . . . manpower" in the PCRA proceedings was "something one would expect in major litigation involving large law firms." *Spotz*, 18 A.3d at 332 (Castille, C.J., concurring). However, I am not quite sure why the same kind of meticulous devotion of resources should not be available to someone who has been condemned to die by the

---

[1] Then-Chief Justice Castille was joined by then-Justice McAfferty and joined in part by then-Justice Melvin. Although each of these jurists has since left the Pennsylvania Supreme Court, I refer to them as "Chief Justice" or "Justice" for the sake of simplicity.

[2] The opinion further described the representation as abusive and inappropriate. *See Spotz*, 165 A.3d at 330 (Castille, C.J., concurring) ("[I]it is time to take more seriously requests by the Commonwealth to order removal of the Defender in cases where, as is becoming distressingly frequent, their lawyers act inappropriately."); *id.* ("[I]t is not clear that the courts of this Commonwealth are obliged to suffer continued abuses by federal 'volunteer' counsel paid by the federal courts."); *id.* at 333 ("The Defender's briefing in this Court is similarly abusive."); *id.* at 335 (noting that, although the presence of the Federal Community Defender "spares Pennsylvania taxpayers the direct expense of state-appointed counsel[,] . . . that veneer ignores the reality of the time lost and the expenses generated in the face of the resources and litigation agenda of the Defender"); *id.* at 336 (referring to "the morass that is the Defender's brief").

state and who seeks to challenge the legality of that punishment. State post-conviction proceedings *are* a critical stage of litigation for those challenging their capital murder convictions or death sentences. Surely, these cases are not less important than the "high dollar" litigation to which large law firms so often devote substantial resources.[3]

The ultimate fate of a habeas petitioner in federal court depends to a very large extent on the performance of counsel in state post-conviction proceedings. Indeed, as appreciated by my colleagues, "state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The state post-conviction stage is often a habeas petitioner's first opportunity to raise claims that certain constitutional rights have been violated, and many such claims require significant investigation. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) (noting that, in that case, "the initial-review collateral proceeding [was] the first designated proceeding for a prisoner to raise a [Sixth Amendment] claim of ineffective assistance at trial"); *Commonwealth v. Grant*, 813 A.2d 726, 735 (Pa. 2002) (noting that the practice of most state and federal courts is to "only review those claims on direct appeal that can be adequately reviewed on the existing record[,]" and deciding that ineffective assistance of counsel claims are properly presented in state collateral proceedings). With very limited exceptions, a petitioner must raise all claims during state post-conviction proceedings or forfeit review of those claims in federal court. 28 U.S.C. § 2254(b)(1) (2012); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Any federal review is almost always limited to the results of the investigations that occurred during state post-conviction proceedings.

Moreover, as any experienced practitioner appreciates, it is exceedingly difficult to introduce additional evidence in support of these claims in federal court. 28 U.S.C. §

---

[3] In making this point, I do not mean to minimize the heinous nature of the crimes which many of the Defender's clients were convicted of. However, that is simply not the point, nor can it be relevant to the clients' entitlement to counsel under our system of justice.

2254(e)(2). Thus, after a state court has ruled on the merits of a condemned petitioner's post-conviction claim, "the die is cast"—as that ruling will only be disturbed during federal habeas corpus review if the state court's judgment "was contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* § 2254(d)(1). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Thus, even if a federal court has a firm belief that the state court's ruling on a petitioner's federal claim was incorrect, the federal court usually must defer to the state ruling. *See Harrington*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (citation omitted)). It is readily apparent to the lawyers who litigate and the judges who decide these cases that procedural and substantive mistakes of state post-conviction counsel can destroy the chances of vindicating even meritorious constitutional claims in federal court.

Conversely, a thoroughly investigated and well-presented petition for post-conviction relief in state PCRA proceedings can ensure that petitioners' claims are fully heard and appropriately decided on the merits, rather than going unresolved in federal court because of earlier procedural defects. In addition to the important investigative and substantive legal work that an attorney must undertake during post-conviction proceedings in state court, attorneys must fastidiously comply with state procedural rules and the one-year statute of limitations contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)—which can be notoriously difficult to calculate—or risk being barred in federal court on procedural grounds. *See* 28 U.S.C. § 2244(d); *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991) ("The [independent and adequate state ground] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 416 n.6 (2005) (discussing

4

different means of calculating AEDPA's one-year limitations period).[4]

The labyrinthine complexity of federal habeas review has caused one noted jurist to conclude that AEDPA's "thicket of procedural brambles" is one of the most difficult legal schemes for an attorney to navigate. *In re Davis*, 565 F.3d 810, 827 (11th Cir. 2009) (Barkett, J., dissenting). Indeed, AEDPA's procedural obstacle course compares to the notoriously vexing Rule Against Perpetuities insofar as both enmesh the unwary (or unseasoned) lawyer in a procedural minefield that can put him or her out of court.[5] Even if a petitioner's claims are eventually heard in federal court, initial missteps can increase the expense and time of the litigation there. *See, e.g.*, *Maples*, 132 S. Ct. at 916–17 (noting that the issue of whether a petitioner could excuse his procedural default, caused by negligent attorneys' missing a state court filing deadline, had been litigated extensively

---

[4] "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A procedural default caused by state post-conviction counsel's mistake may also be excused if agency relationship between the lawyer and client had been severed, see *Maples v. Thomas*, 132 S. Ct. 912 (2012), or (in more limited circumstances) if the state post-conviction counsel was unconstitutionally inadequate, see *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012). However, relief on the basis of inadequate state post-conviction counsel remains difficult to obtain. *See Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task.").

[5] *See* W. Barton Leach, *Perpetuities: New Absurdity, Judicial and Statutory Correctives*, 73 HARV. L. REV. 1318, 1322 (1960) ("[T]he esoteric learning of the Rule Against Perpetuities is, apart from dim memories from student days, a monopoly of lawyers who deal in trusts and estates.").

below).  Deciding issues of life and death on such procedural intricacies threatens to undermine trust and confidence in the accuracy of the criminal justice system.  *See* Brendan Lowe, *Will Georgia Kill an Innocent Man?*, TIME, July 13, 2007, http://content.time.com/time/nation/article/ 0,8599,1643384,00.html (explaining that the requirements of AEDPA made it difficult for petitioner Troy Davis to litigate his claim of actual innocence).

Systematic attempts to disqualify competent Federal Community Defender attorneys from representing clients in state post-conviction proceedings are all the more perplexing and regrettable when one considers the plethora of literature discussing how inadequate representation at the state post-conviction stage increases the cost of the criminal justice system and creates a very real risk of miscarriages of justice. *See* Ken Armstrong, *Lethal Mix: Lawyers' Mistakes, Unforgiving Law*, WASH. POST, Nov. 16, 2014, at A1.  For example, many petitioners have been barred from federal court because their lawyer missed a deadline.  *See id.*  There are numerous reasons why this should concern prosecutors as much as defense counsel—not the least of which is that some actually innocent petitioners only gain relief at the federal habeas corpus stage of their post-conviction appeals process. *See id.* (noting, by way of example, that "of the 12 condemned prisoners who have left death row in Texas after being exonerated since 1987, five of them were spared in federal habeas corpus proceedings").[6]  There were at least 125 exonerations in 2014—the highest in recorded history. *See* NAT'L REGISTRY OF EXONERATIONS, EXONERATIONS IN 2014 at 1 (2015), *available at* https://www.law. umich.edu/special/exoneration/Documents/Exonerations_in_2 014_report.pdf.  Access to the Great Writ can be particularly

---

[6] *See also Berger v. United States*, 295 U.S. 78, 88 (1935) ("[W]hile [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.").

critical to death-sentenced petitioners, some of whom may have meritorious claims of actual innocence.[7]

Against this backdrop, the Federal Community Defender has apparently concluded that representing these petitioners at an earlier stage of their post-conviction appeals process is consistent with its purpose, and the Administrative Office of the United States Courts has neither voiced an objection, nor chosen to interfere with this representation. Rather, the Commonwealth (*i.e.*, opposing counsel) is attempting to disqualify highly qualified defense counsel from representing these death-sentenced petitioners in state court. The Commonwealth is obviously not objecting because the Federal Community Defender is providing inadequate representation and thereby denying the petitioners the constitutional rights that all parties seek to respect. Rather, the objection seems to be that the Federal Community Defender is providing too much defense to the accused. To again quote the criticism from the *Spotz* concurrence, they are approaching the litigation the same way a large law firm might approach representation of a client in "major litigation" concerning large sums of money. *See Spotz*, 18 A.3d at 332 (Castille, C.J., concurring).

## II.     The Authority for the Disqualification Motions

The Majority Opinion notes that it is "unclear" whether the Orders in this case were actually issued pursuant to the "named source of state authority," Article V, § 10(c) of the Pennsylvania Constitution. Maj. Op. 31. It is not only

---

[7] This is not to suggest that state courts are less capable of ruling on constitutional claims, or that lawyers other than the Federal Community Defender are less capable of litigating them. However, it would be naïve to think that the investigation, presentation, and preservation of these claims is a simple task, or that the skill with which the claims are presented to state and federal courts has no effect on how the courts resolve those claims. The petitioners in these cases understand the stakes of this litigation, and they have chosen the Defender as their counsel of choice. Given that context and the lack of sanctionable misbehavior by the Federal Community Defender, I merely urge that we respect that decision.

7

unclear, it is quite dubious. I separately address this issue to highlight the absence of authority to support the Commonwealth's argument and to emphasize the extent to which the legal underpinnings of the Commonwealth's argument have shifted during this litigation. The Commonwealth's current theory appears to be that state law authorizes promulgation of new disqualification rules targeted at specific Pennsylvania attorneys in specific cases. Although both the weakness of that position as well as the extent to which the Commonwealth has previously relied on a different theory are worth emphasizing, I nevertheless agree with the Majority's conclusion that the Commonwealth's claims are preempted, even if they were properly based in state law.

### A.    The Commonwealth's legal rationales

The Commonwealth did not initially rely on the Pennsylvania Constitution in seeking disqualification of the Federal Community Defender attorneys. Rather, the Commonwealth claimed it was seeking to disqualify the Federal Community Defender from appearing in state court because of an alleged misuse of federal funds. The district court in *Mitchell*, one of the cases that was consolidated for this appeal, accurately described the Commonwealth's litigation theory as follows:

> The Commonwealth's seven-page motion devoted almost two pages of citations to its allegation that the presence of federally-funded [Federal Community Defender] lawyers in Mitchell's state case was unlawful under federal law. Mot. for Removal ¶ 6. It asserted no corollary state law cause of action, and it made no reference to an attorney disqualification proceeding or to any violation of the rules of professional conduct. The motion offered a single state law citation: it pled jurisdictional authority to pursue the matter under Section 10(c) of the state Constitution, the general provision endowing the Pennsylvania Supreme Court with the right to govern its courts. *Id.* ¶ 7. Even this citation, however, was secondary to its assertion, earlier in the paragraph, that it had

concurrent jurisdiction to enforce federal law. *Id.*

*In re Pennsylvania*, No. 13-1871, 2013 WL 4193960, at \*15 (E.D. Pa. Aug. 15, 2013) (footnote omitted) [hereinafter *Mitchell*]. As the *Mitchell* court noted, § 10 of the Pennsylvania Constitution was only used to justify opposition to the Federal Community Defender's representation of capital defendants *after* the Federal Community Defender removed this action to federal court. However, even then, § 10 was more of a passing reference than the foundation of the Commonwealth's arguments in the district courts.

Article V, § 10(c) of the Pennsylvania Constitution allows the Pennsylvania Supreme Court to make "general rules" to govern the state court system. PA. CONST., art. V § 10(c). However, §10(c) is not cited at all in the Commonwealth's briefs to this Court. Instead, the Commonwealth stated generally that the disqualification motions were rooted in the "sovereign authority of Pennsylvania, including its power to supervise the practice of law under Article V, § 10 of the State constitution." Com. First Step Br. 38. It later cited to Article V, § 10(a) of the Pennsylvania Constitution as the basis for the state's sovereign power to "regulate[] the practice of law in Pennsylvania State courts." Com. Third Step Br. 37; *see also id.* at 34.

By contrast, the basis for the Commonwealth's challenge to the Federal Community Defender at the beginning of this litigation was federal law. The rules articulated by the state Supreme Court in these consolidated cases differed slightly in their wording, but the main thrust of each was as follows:

> If federal funds were used to litigate the PCRA [proceeding] . . . the participation of the [Federal Community Defender] in the case may well be unauthorized by federal court order or federal law. Accordingly, on remand, the PCRA court is directed to determine whether to formally appoint appropriate post-conviction

9

counsel and to consider whether the [Federal Community Defender] may or should lawfully represent appellant in this state capital PCRA proceeding.

Maj. Op. 11 (quoting *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1151 (Pa. 2012)). Not only was federal law the initial basis for these Orders, it was the *only* justification given in state court for disqualifying the Federal Community Defender. Thus, far from proceeding on a state law theory, the Commonwealth originally claimed that its opposition to the Federal Community Defender's representation was based on the Commonwealth's desire to enforce *federal* law.

The Commonwealth concedes that it lacks a right of action under the Criminal Justice Act, 18 U.S.C. § 3006A *et. seq*, and I agree with the Majority's conclusion that the Commonwealth may therefore not "claim a direct violation of federal law." Maj. Op. 31. Because the Commonwealth has no right of action to enforce federal law directly, it also does not have the authority to enforce compliance with federal law indirectly through a new state rule targeted at specific attorneys. *See Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 131 S. Ct. 1342, 1345 (2011) (noting that direct and indirect legal challenges are "one and the same" and must be treated as such, "[n]o matter the clothing in which [litigants] dress their claims" (quoting *Tenet v. Doe*, 544 U.S. 1, 8 (2005) (internal quotation marks omitted)). The *post hoc* nature of the Commonwealth's assertion that the rules aimed at the Federal Community Defender were actually made pursuant to § 10(c), and the absence of supporting authority for this theory, seriously undermine the credibility of that assertion.

### B. State law cause of action

As my colleagues appreciate, and as I explained at the outset, the impetus for this litigation, and ultimately this new "rule," was the concurring opinion in *Spotz* that accused the Federal Community Defender in the PCRA litigation of being "abusive," "obstructionist," and "contemptuous." 18 A.3d at 330–33 (Castille, C.J., concurring). It also referred to the alleged use of federal funds for that purpose as "perverse." *Id.*

at 331.[8]  The Pennsylvania Supreme Court then promulgated what amounts to a new "rule" in cases where the Federal Community Defender was representing a PCRA petitioner: that the lower courts should consider disqualifying counsel if they conclude that the Federal Community Defender is misusing federal funds.  *See, e.g.*, *Sepulveda*, 55 A.3d at 1151.  However, because this rule bears no resemblance to the procedural rules that the state Supreme Court has historically promulgated or enforced pursuant to § 10(c), the proposition that § 10(c) actually provides authority for the disqualification rule is tenuous at best.

---

[8] The Commonwealth cites to the *Spotz* line of reasoning in its brief to this Court, arguing that the Federal Community Defender has "pursued a strategy to overwhelm the state courts with volumes of claims and pleadings, many simply frivolous, a strategy which burdens prosecutors and can shut down a trial court for weeks." Com. First Step Br. 48 (internal quotation marks omitted). The criticism leveled at the Federal Community Defender in *Spotz*, and repeated by the Commonwealth in its briefing, goes beyond accusations of zealousness or merely over-trying a case. The Chief Justice and the concurring Justices accuse the Federal Community Defender of engaging in tactics that are intended to obstruct the state's judicial process and thereby halt the state's attempt to enforce the death penalty. *See Spotz*, 18 A.3d at 331 (Castille, C.J., concurring). Later, in response to a motion asking him to withdraw that concurring opinion, Chief Justice Castille issued a Single Justice Opinion on Post-Decisional Motions, which reaffirmed the importance of "principled representation of indigent capital defendants" as being "lawyering in the best tradition of the bar." *Commonwealth v Spotz*, 99 A.3d 866, 867 (2014) (Castille, C.J.). However, the opinion again described representation of the Federal Community Defender as advancing "an agenda beyond mere zealous representation, one which routinely pushes, and in frequent instances, as here, far exceeds ethical boundaries" in pursuit of its "global agenda." *Id.* at 867. The opinion then sets forth examples to support its accusation that the Federal Community Defenders "**are at bottom gaming a system and erecting roadblocks in aid of a singular goal—keeping [their client] from being put to death.**" *Id.* at 868 (emphasis in original).

The Pennsylvania Constitution states, in relevant part, that "[t]he Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts . . . if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant. . . ." PA. CONST., art. V § 10(c). Though § 10 gives the state Supreme Court authority to "exercise general supervisory . . . authority" over the courts and to prescribe "general rules" regulating the courts, nothing about the rules announced in these cases is the least bit "general." PA. CONST., art. V § 10(a), (c). Instead, as my colleagues note, the Pennsylvania Supreme Court decreed that "if the Federal Community Defender fails to show that its actions representing its clients are entirely 'privately financed' with non-federal funds, the state PCRA court is to disqualify the Federal Community Defender as counsel." Maj. Op. 31. Rather than being a general rule, the Order that energizes this dispute is aimed squarely and solely at the Federal Community Defender.

The Pennsylvania Supreme Court has exercised its § 10 power in a number of different ways, but it has not previously promulgated a targeted rule like the one that is purportedly present here. Moreover, its previous exercises of § 10 authority are so dissimilar from this case that they provide little support for the Commonwealth's current theory. For example, the Court has promulgated and enforced general rules of civil and appellate procedure.[9] It has exercised its § 10(c) power to regulate judges, attorneys, and the practice of law by creating and enforcing the Code of Judicial Conduct, which regulates the activity of judges,[10] and by defining and

---

[9] *See Commonwealth v. Rose*, 82 A.3d 426 (Pa. 2013); *Laudenberger v. Port Auth. of Allegheny Cnty.*, 436 A.2d 147, 155 (Pa. 1981) (referring to the state Supreme Court's "constitutional rule-making authority").

[10] *See Commonwealth v. Melvin*, 103 A.3d 1, 14 (Pa. Super. Ct. 2014).

12

regulating the practice of law in Pennsylvania.[11]  It has also maintained its exclusive authority over the regulation of attorneys in the state by invalidating legislation that attempted to regulate this area.[12]  In a more unique use of this power, the state court established procedures to implement a new constitutional rule announced by the United States Supreme Court.[13]  Taken together, these cases stand for the proposition that the state court, ethics board, or other appropriate entity can make and enforce clearly-established, generally applicable rules of conduct to govern the conduct of judges and lawyers in state courts.

*In re Merlo*, the main case cited by the Commonwealth in support of its actions here, is an illustrative example of the Pennsylvania Supreme Court's § 10 power. 17 A.3d 869 (2011).  Though the Commonwealth asserts that *Merlo* supports its claim, the run-of-the-mill attorney discipline case is so dissimilar from the instant case that it actually undercuts the Commonwealth's positon.  In *Merlo*, a local judge who had been suspended for absenteeism and for being abusive towards parties petitioned to set aside her suspension on the ground that the Supreme Court did not have the power to suspend her.  *Id.* at 871.  The state Supreme Court had suspended the judge after concluding that the Judicial Conduct Board had probable cause to file a formal charge against her.  That charge asserted various violations of the Rules Governing Standards of Conduct of Magisterial District Judges.  In its decision, Pennsylvania Supreme Court explained that an earlier amendment to the state constitution

---

[11] *See Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 432–33 (Pa. Super. Ct. 2014).

[12] *See Wajert v. State Ethics Comm'n*, 420 A.2d 439, 442 (Pa. 1980).

[13] *See Commonwealth v. Hackett*, 99 A.3d 11, 26 (Pa. 2014) (interpreting *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that intellectually disabled people could not be executed, but which initially gave states the ability to establish procedures to assess whether capital defendants were intellectual disabled).

had not stripped it of its general and broad power to supervise attorneys and enforce the state ethics rules. *Id.*

*Merlo* thus demonstrates how the Pennsylvania Supreme Court regulates attorney discipline: by applying general rules of conduct equally to all lawyers. The additional cases cited by the Commonwealth also generally support the position that the Pennsylvania Supreme Court has retained the power to regulate the conduct of lawyers through enforcement of the state's ethical and conduct rules. *See Office of Disciplinary Counsel v. Jepsen*, 787 A.2d 420, 424–25 (Pa. 2002) (holding that the Court of Judicial Discipline does not have exclusive authority over regulating lawyers' conduct).[14] It is clear that Pennsylvania courts and the state

---

[14] The cases relied on by the Commonwealth also explain that courts themselves, not merely the state disciplinary board, have the power to enforce the state ethical rules against lawyers who appear before them. *Slater v. Rimar, Inc.*, 338 A.2d 584, 587 (1975) (explaining that a judge may disqualify an attorney appearing before him who is conflicted out of representing his client); *Am. Dredging Co. v. City of Phila.*, 389 A.2d 568, 571–72 (1978) (noting that a trial court has the power and duty to ensure that lawyers appearing before it comply with the Code of Professional Responsibility, and considering the merits of whether an attorney betrayed the confidence of a client). Finally, the authority cited by the Commonwealth makes clear that a state's ability to regulate lawyers is undoubtedly one of its important roles—though that power is not without limits. *See, e.g.*, *Leis v. Flynt*, 439 U.S. 438, 442–43 (1979) (holding that out-of-state attorneys did not have a federal constitutional right to appear pro hac vice in Ohio court); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 97 S. Ct. 2691, 2694 (1977) (holding that a state rule barring lawyers from advertising their services was not challengeable under the Sherman Act but also that the state rule, as applied, violated the attorneys' First Amendment free speech rights). The Commonwealth also referred to *Hoover v. Ronwin*, 466 U.S. 558 (1984), and *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975), which involved challenges under the Sherman Act to the grading of the Arizona bar exam and a fee schedule published by a Virginia county bar, respectively. Neither supports the Commonwealth's argument that its state

disciplinary board have the authority to discipline *any* attorney whose conduct so transcends the bounds of propriety as to be sanctionable. However, none of the generally applicable rules that regulate the conduct of Pennsylvania lawyers were even cited in the disqualification orders before us.[15] To the extent that the Federal Community Defender's zealousness violates generally-applicable codes of conduct, the appropriate remedy would appear to be enforcing those codes of conduct in specific instances against specific attorneys rather than systematically depriving condemned prisoners of their counsel of choice as a matter of policy.

The issue here is not whether the Pennsylvania Supreme Court can enforce Pennsylvania's ethical rules; it surely can, but the Disqualification Orders in these cases were not issued pursuant to a charge that the Federal Community Defender violated a specific rule of conduct. Rather, the question here is what rule or law is actually being enforced. The Federal Community Defender argues that the Commonwealth is impermissibly trying to enforce federal law. The Commonwealth now relies upon a state law cause of action. However, the Commonwealth has not directed us to a previous instance where § 10 has been used to support what it attempts in this case: enforcement of a specific rule that is aimed directly at a single legal office or attorney based on conduct which has not been found to violate any of

---

constitution is a proper basis of authority for the disqualification motions in to this case.

[15] The Commonwealth argued at a hearing in the district court in the *Mitchell* litigation that Pennsylvania Rule of Professional Conduct 8.3(a) was the true basis of the disqualification motion. That rule "instructs attorneys to inform 'the appropriate professional authority' if he or she 'knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer.'" *Mitchell*, 2013 WL 4193960, at *14 (citing 204 Pa. Code § 8.3(a)). This is the only mention of an existing Rule of Professional Conduct of which I am aware. The Commonwealth appears to have abandoned this argument on appeal.

15

Pennsylvania's general rules governing the conduct of lawyers. The absence of any such citation is understandable, as I have not been able to find any such case. Therefore, even if it were not preempted, the purported disqualification rule here would not be authorized under state law.[16]

## III.    Conclusion

Though this dispute has been cloaked in claims of state authority and appeals to principles of federalism, I am unfortunately forced to conclude that this suit actually arises out of simple animosity or a difference in opinion regarding how capital cases should be litigated. Given the costs of capital litigation and the very real stakes for the petitioners in these cases, it is extremely regrettable that this debate has now played out in our judicial forum.

---

[16] Like my colleagues, I recognize that the Pennsylvania Supreme Court is the ultimate arbiter of the meaning of the state constitution. However, neither the Majority Opinion nor this opinion relies on an interpretation of state law. Moreover, as explained, federal law preempts any state law cause of action.