[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15207
_____

D.C. Docket No. 2:15-cv-00129-WS-C


PAMELA CAVER,
CHRISTINE GRANDISON,
DEXTER GRANDISON,

Plaintiffs - Appellants,

versus

CENTRAL ALABAMA ELECTRIC COOPERATIVE,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(January 12, 2017)

Before TJOFLAT and HULL, Circuit Judges, and MENDOZA,[*] District Judge.

HULL, Circuit Judge:

Plaintiff Pamela Caver and others, on behalf of members of Defendant Central Alabama Electric Cooperative ("CAEC"), brought a putative class action against CAEC, alleging that CAEC wrongfully had refused to pay out "excess revenues" in cash to its members. CAEC supplies electricity to rural communities in Alabama. The federal government loans substantial capital to CAEC and highly regulates CAEC's operations and provision of government-subsidized electricity to rural customers.

Defendant CAEC removed this case to federal court under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). The district court denied Plaintiff Caver's motion to remand the case back to state court.

Subsequently, the district court granted CAEC's motion to dismiss the complaint. The district court pointed out that when CAEC's revenues exceed its operating costs and other expenses, CAEC does credit each members' capital account with the cooperative. The district court held that CAEC's distribution of excess revenues to its members by making credits to their capital accounts, as opposed to making cash payments, complied with Alabama state law. After

_____

[*]Honorable Carlos Eduardo Mendoza, United States District Judge for the Middle District of Florida, sitting by designation.

2

thorough review and with the benefit of oral argument, we affirm the district court's ruling on both issues.

## I.    JURISDICTION BACKGROUND

As background to the jurisdiction issue, we review the extensive interrelationship between the federal government and Defendant CAEC.

## A.    History of Rural Electrification

In 1935, during the Great Depression, President Franklin D. Roosevelt, through an executive order, created the Rural Electrification Administration ("REA") "[t]o initiate, formulate, administer, and supervise a program of approved projects with respect to the generation, transmission, and distribution of electric energy in rural areas." Exec. Order No. 7037. The following year, Congress passed the Rural Electrification Act of 1936 (the "RE Act"). 7 U.S.C. § 901. By passing the RE Act, Congress affirmed the creation of the REA and authorized the REA to make loans "for rural electrification and the furnishing of electric energy to persons in rural areas." Pub. L. No. 74-605, 49 Stat. 1363; accord 7 U.S.C. § 902(a).

The federal government thus initiated this program of rural electrification. Specifically, the program was formulated and supervised by the REA, and all projects required REA approval. The President and Congress's objective in creating the REA "was to provide electricity to those sparsely settled areas which

3

the investor-owned utilities had not found it profitable to service.  To this end REA makes long-term low-interest loans to approved non-profit cooperatives."  Salt River Project Agric. Improvement & Power Dist. v. Fed. Power Comm'n, 391 F.2d 470, 473 (D.C. Cir. 1968); see also City of Stilwell v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1041 (10th Cir. 1996) (explaining that the REA "was created by the [RE Act] to provide financing to power suppliers as an inducement to provide economical electric power to rural America.").

"In response to the RE Act and its precursor Executive Branch order, cooperative electrical systems were formed to seek government subsidized loans and deliver electricity to rural consumers."  In re Cajun Elec. Power Coop., Inc., 109 F.3d 248, 252 (5th Cir. 1997).  In 1939, Alabama passed the Electric Cooperative Act, which provides for the creation of cooperative, nonprofit membership corporations "for the purpose of supplying electric energy and promoting and extending the use thereof."  Ala. Code § 37-6-2.  Other states approved similar legislation, and by 1968 there were "nearly 1,000 rural electric cooperatives which own and operate electric systems financed by the United States, acting through REA, pursuant to the Rural Electrification Act of 1936."  Salt River Project, 391 F.2d at 472.

**B.    Federal Loans and Regulation**

Defendant CAEC, like other rural electric cooperatives, receives substantial loans from the federal government, specifically the United States Department of Agriculture Rural Utilities Services ("RUS").  The RUS is the successor to the REA.

The latest loan agreement between CAEC and RUS is dated February 2, 2009.  The loan agreement limits CAEC's discretion to make "Distributions" to its members.  The loan agreement defines "Distributions" to mean to "declare or pay any dividends, or pay or determine to pay any patronage refunds, or retire any patronage capital or make any other Cash Distributions, to its members, stockholders or consumers."  Loan Agreement Art. 1.

Under the loan agreement, CAEC cannot pay patronage refunds, or retire any patronage capital, or make any cash distributions to its members if doing so would cause its equity to fall below 30% of its total assets, as follows:

**Limitation on Distributions.**

Without the prior written approval of RUS, [CAEC] shall not in any calendar year make any Distributions (exclusive of any Distributions to the estates of deceased natural patrons) to its members, stockholders or consumers except as follows:

(a)    Equity above 30%.  If, after giving effect to any such Distribution, the Equity of [CAEC] shall be greater than or equal to 30% of its Total Assets; or

(b)    Equity above 20%.  If, after giving effect to any such Distribution, the Equity of [CAEC] shall be greater than or equal to 20% of its Total Assets and the aggregate of all Distributions made during the calendar year when added to such Distribution shall be less than or equal to 25% of the prior year's margins.

Provided however, that in no event shall [CAEC] make any Distributions if there is unpaid when due any installment of principal of (premium, if any) or interest on any of its payment obligations secured by the Mortgage, if [CAEC] is otherwise in default hereunder or if, after giving effect to any such Distribution, [CAEC's] current and accrued assets would be less than its current and accrued liabilities.

Loan Agreement § 6.8.

A loan agreement with RUS, such as CAEC's, "imposes certain restrictions and controls on the borrowers and gives RUS . . . the right to approve or disapprove certain actions contemplated by the borrowers."  7 C.F.R. § 1717.600(a).[1]  RUS's regulations contain the same restriction on distributions as the loan agreement.  7 C.F.R. § 1717.617.  Among other things, the loan agreement and regulations allow RUS, at certain times: (1) to set standards for property maintenance; (2) to set accounting standards; (3) to inspect the utility system, the books, and documents of every kind; (4) to regulate power requirement studies; (5) to regulate long-range engineering and construction plans, as well as design and

---

[1]The record contains only limited excerpts of CAEC's loan agreement with RUS.  Caver, however, cites to the model loan agreement contained in the federal regulations as reflecting the terms of CAEC's contract with RUS.  The model loan agreement generally contains the restrictions discussed herein and requires compliance with all relevant laws and regulations.  See 7 C.F.R. § 1718, app. A.

construction standards; (6) to approve plans and specifications for construction; and (7) to set contract bidding requirements.  See generally 7 C.F.R. § 1717.600, et seq.; 7 C.F.R. § 1718, app. A.  The loan agreement and the regulations also require CAEC, in certain situations, to seek RUS approval: (1) to extend its electric system; (2) to hire a general manager; (3) to enter into certain contracts; (4) to merge or sell portions of its business or assets; (5) to make distributions to its members; or (6) to take on additional debt.  See generally § 1717.600, et seq.; § 1718, app. A.  In addition to these federal regulations and restrictions, Alabama law also regulates CAEC's operations as discussed below.

## C.    Alabama Code § 37-6-1, et seq.

Alabama state law authorizes the creation of rural electric distribution cooperatives, such as Defendant CAEC, and regulates them.[2]  Ala. Code § 37-6-1, et seq.  As a cooperative, Defendant CAEC is prohibited from making a profit on business conducted with the members.  Ala. Code §§ 37-6-2, 37-6-20.

The difference between CAEC's revenues and operating costs and other expenses is considered "margins" or "excess revenues" that belong to its members as "patronage capital."  Loan Agreement § 6.8; CAEC Bylaws § 8.02; Ala. Code § 37-6-20.  Defendant CAEC must account for the patronage capital that belongs

---

[2]When considering a motion to dismiss, infra Part III, we take the complaint's factual allegations as true and construe them in the light most favorable to the plaintiffs.  Rivell v. Private Health Care Sys., Inc., 520 F.3d 1308, 1309 (11th Cir. 2008).  For this reason, we rely on Caver's operative complaint for the facts of this case.

to its members.  CAEC Bylaws § 8.02.  CAEC's members each have an account in his or her name that reflects a credit or debit for each year the member was or continues to be a CAEC member.

The particular Alabama statue at issue in this case is § 37-6-20 of the Alabama Code, which provides for the "Disposition of excess revenues" by an electric cooperative such as CAEC.  Specifically, § 37-6-20 provides that the "excess revenues"[3] of CAEC should be distributed, "as, and in the manner, provided in the bylaws," either by "patronage refunds" or "rate reductions," as follows:

> ["Excess revenues"] shall be distributed by the cooperative to its members as, and in the manner, provided in the bylaws, either as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year or by way of general rate reductions, or by combination of such methods. Nothing contained in this article shall be construed to prohibit the payment by a cooperative of all or any part of its indebtedness prior to the date when the same shall become due.

Ala. Code § 37-6-20 (emphasis added).

---

[3]Section 37-6-20 defines "excess revenues" as those revenues for any fiscal year in excess of the amount necessary to (1) "defray expenses of the cooperative and of the operation and maintenance of its facilities during such fiscal year"; (2) "pay interest and principal obligations of the cooperative coming due in such fiscal year"; (3) "finance or to provide a reserve for the financing of, the construction or acquisition by the cooperative of additional facilities to the extent determined by the board of trustees"; (4) "provide a reasonable reserve for working capital"; (5) "provide a reserve for the payment of indebtedness of the cooperative maturing more than one year after the date of the incurrence of such indebtedness in an amount not less than the total of the interest and principal payments in respect thereof required to be made during the next following fiscal year"; and (6) "provide a fund for education in cooperation and for the dissemination of information concerning the effective use of electric energy and other services made available by the cooperative."  Ala. Code § 37-6-20.

8

CAEC's bylaws provide that (1) CAEC shall account, on a patronage basis, for all revenue amounts received in excess of operating costs and expenses chargeable against the furnishing of electricity and (2) CAEC shall pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses, as follows:

> **Patronage Capital in Connection with Furnishing Electric Energy.** . . . In order to induce patronage and to assure that the Cooperative will operate on a not-for-profit basis the Cooperative is obligated to account on a patronage basis to all its patrons, members and non-members alike, for all amounts received and receivable from the furnishing of electric energy in excess of operating costs and expenses properly chargeable against the furnishing of electric energy. All such amounts in excess of operating costs and expenses at the moment of receipt by the Cooperative are received with the understanding that they are furnished by the patrons, members and non-members alike, as capital. The Cooperative is obligated to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses.

CAEC Bylaws § 8.02.[4]  In addition, the bylaws explain that these capital account credits should be treated as though they had been paid in cash: "All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for

---

[4]The bylaws are only quoted in CAEC's Motion to Dismiss, but the district court properly considered them without converting the motion to dismiss into a motion for summary judgment because the document is central to Caver's claim, and the authenticity of that portion of the bylaws is undisputed. Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005).

capital." Id.  The bylaws also provide that the bylaws themselves constitute a contract between CAEC and each member.  Id.

Pursuant to its bylaws, Defendant CAEC accounts for and distributes the patronage refund owed by crediting each member's individual capital account for the member's portion of the excess revenues.  Although it distributes the patronage refund to the members' capital accounts, CAEC does not actually pay out that money in cash for years.  Sometimes those payouts come as late as thirty years after the credits are earned and when the members to whom they are owed can no longer be found.  According to Caver, CAEC had accrued a total amount of patronage capital exceeding $24 million as of 2013.

Plaintiff Caver alleges that Defendant CAEC violated Alabama Code § 37-6-20, as well its own bylaws, by not paying out its excess revenues in cash to its members annually.  Based on CAEC's alleged violation of Alabama law and its bylaws, Caver's complaint seeks a declaratory judgment and injunctive relief (Count 1) and alleges a claim for breach of contract (Count 2).  The merits issues on appeal revolve around the interplay between Alabama state law, CAEC's bylaws, and CAEC's federal loan agreement with RUS.  However, as a threshold matter, we first must address whether the district court had jurisdiction to decide this case.

## II.    JURISDICTION ANALYSIS

Defendant CAEC removed this case to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  That statute allows removal of any civil action against any officer of the United States, or "any person acting under that officer," "for or relating to any act under color of such office," as follows:

> (a) <u>A civil action</u> or criminal prosecution that is commenced in a State court and <u>that is against</u> or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or <u>any officer (or any person acting under that officer) of the United States</u> or of any agency thereof, in an official or individual capacity, <u>for or relating to any act under color of such office</u> or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1) (emphasis added).[5]  Because CAEC is not a federal officer or agency itself, CAEC must satisfy a three-pronged test to determine whether it may effect removal.  First, CAEC must show that it is a person within the meaning of the statute who acted under a federal officer.  § 1442(a)(1).  Second, CAEC must show that it performed the actions for which it is being sued under color of federal office.  <u>Magnin v. Teledyne Cont'l Motors</u>, 91 F.3d 1424, 1427 (11th Cir. 1996); <u>Florida v. Cohen</u>, 887 F.2d 1451, 1453 (11th Cir. 1989).  Stated another

---

[5]"[W]e review <u>de novo</u> a district court's denial of a motion to remand a state-court action because it implicates subject-matter jurisdiction." <u>Escobar v. Celebration Cruise Operator, Inc.</u>, 805 F.3d 1279, 1283 (11th Cir. 2015), <u>cert. denied</u>, 136 S. Ct. 1158 (2016).

way, CAEC must show "a causal connection between what the officer has done under asserted official authority and the action against him." Magnin, 91 F.3d at 1427 (quotation marks omitted).  Third, CAEC must raise a colorable federal defense.  Id.; Cohen, 887 F.2d at 1453–54.[6]

This "statute's 'basic' purpose is to protect the Federal Government from [state] interference with its 'operations.'" Watson v. Philip Morris Cos., 551 U.S. 142, 150, 127 S. Ct. 2301, 2306 (2007).  "This statute is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." Cohen, 887 F.2d at 1453.

## A.    "Acting Under"

The first question for federal officer removal is whether CAEC was a person "acting under" a federal officer when it took the actions complained of in this case. The parties do not debate that CAEC is a person within the meaning of the statute. Rather, they dispute whether CAEC was fulfilling a basic governmental task, or assisting the government in doing so, and thus "acting under" an officer of the United States.

---

[6]Magnin and Cohen did not address the first prong because there was no debate in those cases that the relevant parties were officers of the United States for purposes of § 1442(a)(1). See Magnin, 91 F.3d at 1428 (involving a Federal Aviation Authority designated manufacturing inspection representative); Cohen, 887 F.2d at 1454 (involving a Deputy Marshal and other federal agents).  Magnin and Cohen therefore addressed only the two "prerequisites" of a causal connection and a colorable federal defense. See Magnin, 91 F.3d at 1427; Cohen, 887 F.2d at 1453-54.

The phrase "acting under" is broad and thus we "liberally construe" this portion of § 1442(a)(1).  Watson, 551 U.S. at 147, 127 S. Ct. at 2304-05.  The Supreme Court in Watson held that a private tobacco company, although highly regulated, was not "acting under" a federal officer.  Id. at 153, 157, 127 S. Ct. at 2308, 2310.  The Supreme Court explained that a "private person's 'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior."  Id. at 152, 127 S. Ct. at 2307.  In other words, the private person must help federal officers fulfill a basic governmental task that the government otherwise would have had to perform.  Id. at 153-54, 127 S. Ct. at 2308.

In Watson, the tobacco company was using the government's required method to test its cigarettes before it sold the cigarettes to the public for its own profit.  Id. at 146, 127 S. Ct. at 2304.  By using that testing method, the tobacco company was "simply complying" with federal law, which does "not" bring a private person within the scope of § 1442(a)(1).  Id. at 152, 127 S. Ct. at 2307.  Similarly, the mere fact that the federal government regulates a private entity does not satisfy the statutory basis for removal under § 1442(a)(1).  Id. at 153, 127 S. Ct. at 2308.  Instead, the relationship between the private person and the federal officer must be one of "subjection, guidance, or control."  Id. at 151, 127 S. Ct. at 2307 (quotation marks omitted).

13

As recounted above, rural electric cooperatives, such as CAEC, are highly regulated by the federal government. Salt River Project, 391 F.2d at 473. "Through its lending authority REA exercises extensive supervision over the planning, construction and operation of the facilities it finances." Id. REA, however, is not a "classic public utility regulatory body" but instead is a "lending agency" that regulates. Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 386, 103 S. Ct. 1905, 1913 (1983) (discussing the scope of REA's regulations). Any loans made by RUS must conform to the agency's regulations and the RE Act. 7 C.F.R. § 1710.100.

Although these federal regulations alone are not enough to satisfy the federal officer removal statute, they do demonstrate the close and extensive relationship between CAEC and RUS, as well as RUS's significant level of control over CAEC's operations. In addition to their obligation to comply with extensive federal regulations, rural cooperatives such as CAEC must also assist RUS with accomplishing its duties or tasks in order to utilize the federal officer removal statute.

Consistent with the historical background discussed earlier, "rural electric cooperatives are something more than public utilities; they are instrumentalities of the United States. They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to rural America." Ala. Power Co. v. Ala. Elec.

14

Coop., Inc., 394 F.2d 672, 677 (5th Cir. 1968) (internal quotation marks omitted).[7] Although Alabama Power Co. involved a power company seeking judicial review of a loan to rural electric cooperatives, its recognition of the role and purpose of rural cooperatives in the federal system is instructive.

Quite simply the REA was designed to guide and control the process of bringing electricity to sparsely populated rural areas that would not otherwise receive electricity. Congress and the President designed a system by which the REA would accomplish these goals by loaning money to state entities, which would carry out these objectives under the REA's close supervision. The federal government, using low-interest loans, funds its objective of providing rural electricity through these cooperatives such as CAEC. These rural electric cooperatives exist to provide a public function conceived of and directed by the federal government.

CAEC therefore helps assist or carry out the duties of RUS and works closely with RUS to fulfill the congressional objective of bringing electricity to rural areas that would otherwise go unserved. In other words, CAEC assists the RUS by "perform[ing] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." Watson, 551 U.S. at 154, 127 S. Ct. at 2308; see also Ruppel v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012)

---

[7]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

15

("'Acting under' covers situations . . . where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); Bennett v. MIS Corp., 607 F.3d 1076, 1088 (6th Cir. 2010) (concluding that company satisfied the "acting under" requirement when "in the absence of a contract with" the company, the government "itself would have had to perform" the task). In this sense, CAEC, a non-profit entity funded in part by federal loans, is closer in kind to a federal contractor performing work on behalf of the government than a private business working for its own ends. See Ruppel, 701 F.3d at 1179, 1181 (concluding that a corporation that supplied the Navy with turbines satisfied the "acting under" requirement); Bennett, 607 F.3d at 1086-88 (holding that a private mold remediation firm, removing mold from an airport, "act[ed] under" a federal officer).

Others courts, in addition to the district court in this case, have concluded, for the same reasons as those discussed here, that rural electric cooperatives are "acting under" a federal officer. See, e.g., Cessna v. Rea Energy Coop., Inc., No. 3:16-42, 2016 WL 3963217, at *5 (W.D. Pa. July 21, 2016) ("In light of the unusually close and detailed regulatory and contractual relationship between [Rea Energy Cooperative] and RUS, and in accordance with the liberal construction of 28 U.S.C. § 1442(a)(1), the Court finds that [Rea Energy Cooperative] was acting under a federal office.") (internal quotation marks omitted). We find the reasoning

16

of Cessna persuasive and agree that CAEC is "acting under" a federal officer for purposes of § 1442(a)(1) based on the long history of RUS's control over CAEC and direction of the federal government's rural electrification program dating back to the Great Depression.

## B.    Causal Connection

The second question for federal officer removal is whether there is a causal connection between Plaintiff Caver's claims and an act of Defendant CAEC that forms the basis of those claims.  Magnin, 91 F.3d at 1427; Cohen, 887 F.2d at 1453-54.  In other words, we must determine whether that act was taken under color of law.  Magnin, 91 F.3d at 1427; Cohen, 887 F.2d at 1453-54.  Section 1442(a)(1) provides that removable claims must be "for or relating to any act" under color of federal office.  28 U.S.C. § 1442(a)(1).  The phrase "relating to" is broad and requires only "a 'connection' or 'association' between the act in question and the federal office."  In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila., 790 F.3d 457, 471 (3d Cir. 2015).[8]  "The hurdle erected by this requirement is quite low . . . ."  Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008).

---

[8]In 2011, Congress amended § 1442(a)(1) to add the phrase "or relating to," which was intended to broaden the scope of acts that allow a federal officer to remove a case to federal court.  In re Commonwealth's Motion, 790 F.3d at 471-72.

The acts that Caver challenges relate to actions of CAEC in not making cash distributions of patronage capital.  In its Notice of Removal, CAEC claims: (1) that the loan agreement with RUS prohibited it from making distributions of patronage capital if doing so would cause its equity to fall below 30% of its total assets and (2) that if CAEC made the distributions sought by Caver, doing so would reduce CAEC's equity on assets to zero percent, resulting in a breach of the loan agreement.  CAEC claims this accumulation of equity from patronage capital contributions "directly resulted from CAEC's compliance with express RUS federal loan requirements to maintain equity at above 30% of assets before any capital cash distributions to members."

These allegations, if true, would establish that the acts for which CAEC is being sued—failure to make distributions of patronage capital—occurred because of CAEC's performance of its duties and loan agreement with RUS.  We therefore conclude that there is a causal nexus between Caver's claims and CAEC's conduct. See Isaacson, 517 F.3d at 138 ("According to their theory of the case, the Government knew that Agent Orange contained dioxin, and the Government controlled the method of formulation.  The action that Plaintiffs challenge, the production of dioxin, naturally would have occurred during the performance of these government-specified duties."); Cessna, 2016 WL 3963217, at *7 (finding the causal nexus requirement satisfied when the rural electricity cooperative's

18

allegations in the notice of removal stated that RUS forbade the actions that the plaintiffs sought); Sparks v. Cullman Elec. Coop., No. 3:15-CV-387-MHH, 2016 WL 927032, at *2 n.5 (N.D. Ala. Mar. 11, 2016) ("To establish a causal connection between what the cooperatives have done based on federal authority and the conduct that gives rise to this action, the electric cooperatives must show that the plaintiffs' claims arise from the electric cooperatives' performance of the cooperatives' contracts with the [Tennessee Valley Authority].").

## C.    Colorable Federal Defense

The third question for federal officer removal is whether Defendant CAEC has raised a colorable federal defense. Magnin, 91 F.3d at 1427; Cohen, 887 F.2d at 1453-54. Our Court gives this portion of § 1442(a)(1) "a broad reading so as to encompass 'all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law.'" Cohen, 887 F.2d at 1454 n.4 (quoting Willingham v. Morgan, 395 U.S. 402, 406–07, 89 S. Ct. 1813, 1816 (1969)). Federal officer removal is thus an exception to the well-pleaded complaint rule, as "the federal-question element is met if the defense depends on federal law." Jefferson Cty. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075 (1999). The colorable federal "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." Magnin, 91 F.3d at 1427. The law does not require that the removing defendant virtually win his case before it can be

19

removed.  Acker, 527 U.S. at 431, 119 S. Ct. at 2075.  Indeed, a core purpose of federal officer removal is to have the validity of the federal defense tried in federal court.  Id.

Here, CAEC has claimed that it performed the acts forming the basis of Plaintiff Caver's state action pursuant to the RUS loan agreement and federal regulations.  Before the district court, CAEC raised the defense of conflict preemption based on the RUS loan agreement and federal regulations.  Conflict preemption occurs when state law actually conflicts with federal law because it is impossible to comply with both the state and federal requirements or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Wiersum v. U.S. Bank, N.A., 785 F.3d 483, 486 (11th Cir. 2015) (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79, 110 S. Ct. 2270, 2275 (1990)), cert. denied, 136 S. Ct. 1655 (2016).

CAEC has an unusually close and detailed regulatory and contractual relationship with RUS dating back to 1939, and that relationship controls almost all of CAEC's actions.  If Plaintiff Caver is correct that the Alabama statute requires the $24 million in equity held in the capital accounts to be paid out in cash annually to its members, CAEC asserts that the Alabama statute would then conflict with RUS's regulations and loan agreement provisions about equity retention.  For example, the federal regulations do not allow distribution of excess

20

revenues if doing so would result in CAEC's remaining equity being less than 30% of its remaining assets. CAEC claims that it can prove such a financial barrier exists under federal law, which would lead to a conflict between federal and state law.

We therefore conclude that CAEC's preemption defense is plausible and satisfies the lenient colorable federal defense requirement for removal under § 1442(a)(1). See Tenn. ex rel. City of Cookeville v. Upper Cumberland Elec. Membership Corp., 256 F. Supp. 2d 754, 758 (M.D. Tenn. 2003) (finding a colorable federal defense of preemption by RUS sufficient under § 1142(a)(1)), aff'd sub nom. City of Cookeville v. Upper Cumberland Elec. Membership Corp., 484 F.3d 380 (6th Cir. 2007).

The Supreme Court's decision in Arkansas Electric Cooperative expressly left open the possibility that a valid rule of the REA affecting rural power cooperatives could preempt state law or state regulation of those cooperatives, as follows:

> There may come a time when the REA changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy. If that were to happen, and if such a rule was valid under the Rural Electrification Act, it would of course pre-empt any further exercise of jurisdiction by the Arkansas PSC. Similarly, as Arkansas already recognizes, the PSC can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the REA. Moreover, even without an explicit statement from the REA, a particular rate set by the Arkansas PSC may so seriously compromise important federal

21

interests, including the ability of the AECC to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act.

461 U.S. at 388–89, 103 S. Ct. at 1915 (citations omitted). While in Arkansas Electric Cooperative the Supreme Court ruled that the REA's published policy did not preempt the state's regulation of wholesale rates, the Supreme Court explicitly stated that a valid REA regulation could preempt state law. Id. at 385-89, 103 S. Ct. at 1913-15. In this case, CAEC has pointed to a RUS regulatory rule concerning equity levels and distribution of patronage capital that it contends preempts state law. We need not, and do not, determine the merits of that position at this time, as we are confident that CAEC's argument is at least colorable and should be tried in federal court.

For the foregoing reasons, we conclude that CAEC properly removed this case under the federal officer removal statute, § 1442(a)(1), and the district court had subject matter jurisdiction to hear the case.

### III.   MOTION TO DISMISS: MERITS

Having concluded federal jurisdiction exists, we now address whether the district court erred in dismissing Plaintiff Caver's complaint.[9] The district court held that CAEC's method of distributing excess revenues through patronage capital accounts satisfies the requirements of Alabama Code § 37-6-20 and

---

[9]We review the district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo, using the same standard as the district court. Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1187 (11th Cir. 2004).

22

CAEC's bylaws. That statute provides, in relevant part, that excess revenues "shall be distributed by the cooperative to its members as, and in the manner, provided in the bylaws, either as patronage refunds . . . or by way of general rate reductions, or by combination of such methods." Ala. Code § 37-6-20 (emphasis added).

On appeal, as she did in the district court, Caver argues that CAEC must annually distribute "patronage refunds" in the form of an annual cash payment to its members. Caver contends that CAEC's allocation of "credits" to members' capital accounts does not constitute a refund because CAEC's members cannot access the credits. Caver describes § 37-6-20 as having a "plain statutory requirement that excess revenue be distributed through refund or rate reduction, not 'crediting' and withholding."

Section 37-6-20 does not speak with the clarity that Caver wishes, and nowhere does that section require a cash payment, much less an annual one. Indeed, the statute does not even define the term "patronage refund" or the word "distributed." Rather, the statute states plainly that the manner of distribution, whether by patronage refund or rate reduction, "shall" be done "as, and in the manner, provided in the bylaws." CAEC's bylaws provide such an express manner for distribution. In the bylaws, CAEC treats its excess revenues as furnished by the patrons to CAEC and credits each patron's capital account for their proportional share of the excess revenues. Those credits are later retired as

23

directed by CAEC's Board of Trustees.  CAEC's bylaws thus use capital account credits as the manner for distributing patronage refunds.

Telling too, the relevant portion of the statute does not use the words "cash" or "pay."  Nor does the statute expressly forbid CAEC from using methods other than a cash payment to make the required distributions.  Other clauses in § 37-6-20 indicate when CAEC must "pay" something rather than "finance" or "provide" for a fund or a reserve.  § 37-6-20.  For patronage refunds, the statute only says that the excess revenues shall be distributed "as, and in the manner, provided in the bylaws."  Id.  Nothing in the statute imposes the specific requirement that all patronage refunds be made in a cash manner.  Caver offers no persuasive reasoning, such as a statutory, textual basis, for why a refund or distribution must be in a cash payment as opposed to a capital account credit.  Instead, the statute allows each rural electric cooperative's bylaws to specify the "manner" in which the cooperative makes distributions through patronage refunds, in effect giving each rural electric cooperative a measure of discretion in carrying out the statutory directives.

The reasoning of at least two Alabama appellate decisions, though both are tax cases and the reasoning is dicta, support a rejection of Caver's reading of § 37-6-20.  In the first case, the Alabama appellate court thoroughly reviewed § 37-6-20 and a rural electric cooperative's system of making refunds to patrons

24

through capital account credits and approved the use of those credits, which created "an obligation to the member against the assets of the cooperative." State v. Pea River Elec. Coop., 434 So. 2d 785, 786 (Ala. Civ. App. 1983).  In a subsequent tax case decided over a decade later, the Alabama appellate court, relying in large part on Pea River, again thoroughly examined § 37-6-20 and the use of capital account credits for refunds and found that § 37-6-20 "mandates that a cooperative return any excess advances to its members and allows those returns to be made in the form of patronage credits." State Dep't of Revenue v. Mon-Cre Tel. Coop., Inc., 702 So. 2d 179, 182 (Ala. Civ. App. 1997).[10]  While these cases did not involve direct challenges to the use of capital account credits (as opposed to cash payments), their reasoning lends credence to CAEC's position in this case.[11]  Both Alabama appellate decisions, dating back to 1983, approved the use of capital account credits to distribute patronage refunds.

Based on the foregoing Alabama law, we must reject Caver's claims that CAEC must distribute patronage refunds only in the form of annual cash payments.

---

[10]Caver directs our attention to several Alabama trial court decisions that have denied motions to dismiss in allegedly similar cases.  Only one of those decisions provides any reasoning, which we find unpersuasive. Harkless v. Dixie Elec. Coop., No. CV 2012-900073 (Ala. Cir. Ct. Oct. 18, 2012).  In that case, the defendant cooperative apparently argued that § 37-6-20 "does not require a refund of 'excess revenues.'" Id. at 3.  Instead of arguing that it does not need to refund excess revenues at all, CAEC presents a stronger argument in this case—that it is providing patronage refunds through patron capital credits, which is the manner of distribution provided for in the bylaws.

[11]We also find Caver's reliance on a Tennessee statute similar to § 37-6-20 unpersuasive for the reasons stated in the district court's order.

Caver's argument assumes, without support, that a refund must be paid in cash. Section 37-6-20 contains no such cash payout requirement.[12] While § 37-6-20 requires that excess revenues be distributed, Caver's claims ignore how § 37-6-20 provides that the manner of distribution of patronage refunds is determined by a cooperative's bylaws. To be clear, our narrow holding here is that § 37-6-20 does not require CAEC to distribute patronage refunds only in a cash payment manner. Caver's complaint therefore fails to state a viable claim because cash payments are not required by the statute, and therefore there is no statutory violation, no breach of contract, and no basis for injunctive relief.

## IV.    CONCLUSION

For the reasons contained herein, we affirm the district court's denial of Plaintiff Caver's motion to remand and grant of Defendant CAEC's motion to dismiss.

**AFFIRMED.**

---

[12]In light of this conclusion, we need not address CAEC's other defenses, including whether the bylaws can waive a patron's statutory right to receive a cash payment or whether RUS regulations in fact preempt § 37-6-20.