In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 19-3159 & 19-3160

SHERRIE BAKER, *et al.*,

*Plaintiffs-Appellees,*

*v.*

ATLANTIC RICHFIELD COMPANY,
E. I. DU PONT DE NEMOURS AND COMPANY, *et al.*,

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:17-cv-00429 — **Joseph S. Van Bokkelen**, *Judge.*

———————

ARGUED JUNE 2, 2020 — DECIDED JUNE 18, 2020

———————

Before FLAUM, KANNE, and BRENNAN, *Circuit Judges.*

FLAUM, *Circuit Judge.* Former residents of the West Calumet Housing Complex sued nine industrial manufacturing companies in Indiana state court. The residents allege that, for most of the twentieth century, each company directly or through a predecessor corporate entity polluted the soil in

and around the site of their later-built residence. Specifically, the residents claim that the companies' operations at these facilities contaminated the property with "lead, arsenic and likely other substances."

Several companies removed the case to federal court under 28 U.S.C. § 1442(a)(1), asserting their right to a federal forum because the case relates to their acts under color of federal office. During World War II, the companies argue, the United States government directed them to produce certain materials for the military, supervised distribution of these goods, and controlled their ultimate usage. The residents disagreed and moved to remand the case back to state court. The district court granted that motion, holding in principle that the companies acted under color of federal office for only a portion of the time period covered by the residents' claims. We reverse.

## I. Background

From 1906 to approximately 1970, the defendants-appellants Atlantic Richfield Company, BP West Coast Products LLC, E. I. du Pont de Nemours and Company, and The Chemours Company (collectively, "the Companies"), their predecessors, and a handful of other entities manufactured certain industrial materials at the U.S. Smelter and Lead Refinery, Inc. Superfund Site in East Chicago, Indiana. In the 1970s, the East Chicago Housing Authority constructed the West Calumet Housing Complex, a low-income residential building, on the same site.

In September 2017, former West Calumet tenants sued the Companies as the successors in interest to International

Smelting and Refining Company (ISR), Anaconda Lead Products Company, International Lead Refining Company, International Smelting Company, and other entities in Indiana state court alleging that they had polluted the soil at and around their modern-day building, exposing the residents to hazardous substances like lead and arsenic. Specifically, the resident-plaintiffs ("the Residents") claimed Atlantic Richfield tortiously contaminated the land between 1938 and 1965, and that E. I. du Pont de Nemours and Company and The Chemours Company (together, "DuPont") did so from 1910 to 1949.

In November 2017, Atlantic Richfield removed the case to federal court under 28 U.S.C. § 1442(a)(1), asserting that it was entitled to a government contractor defense. In support of its notice, Atlantic Richfield contended that its predecessor, ISR, operated a lead refinery, white lead carbonate plant, and zinc oxide plant near the site of the modern-day West Calumet Housing Complex during World War II. At that time, the federal government thoroughly regulated the use of lead and zinc, which ISR sold to entities who were under contract with the government to produce the goods for the military. More importantly, ISR itself held five contracts with the United States Army worth $837,000 (today, approximately $12 million) in sales of zinc oxide.

The materials made by ISR—white lead carbonate, zinc oxide, and lead—were critical wartime commodities because they were necessary to make essential military and civilian goods. Given their critical nature, the United States required ISR to manufacture the zinc oxide, white lead carbonate, and lead produced at the East Chicago site according to detailed federal specifications. Certain regulations also mandated that

ISR prioritize its sales to rubber and paint companies holding defense contracts (setting aside the predetermined quantities for the federal government), which effectively prevented ISR from selling its products to distributors for civilian applications. Indeed, at one point, conservation orders severely restricted the amount of white lead in paint, and as a result, reduced ISR's sales. Similarly, the government either restricted or prohibited the use of zinc to manufacture most civilian products. Other forms of federal oversight included price control, with violations punishable by criminal prosecution and the denial of further supplies. In sum, the government directed nearly every aspect of ISR's production process at the site.

On the same day Atlantic Richfield filed its notice of removal, DuPont joined its codefendant and filed a supplemental notice. DuPont asserted that the United States government directed it to build a facility for the government and then lease it from the government to produce Freon-12 and hydrochloric acid (a byproduct of Freon-12) solely for the government. DuPont's manufacture of Freon-12 resulted in waste streams containing lead and arsenic. Additionally, DuPont received five shipments of surplus lead from the military following the war in September 1945, April 1946, October 1946, and December 1946. The government closely controlled the plant's operation, approving the plans, designs, and schedules for manufacturing. It even assigned a supervising engineer and other support staff to oversee the activities on site.

The Residents moved to remand the case back to state court in December 2017. The district court granted that motion, concluding that the Companies had only acted under

color of federal office for a small part of the alleged time period at issue. Put differently, the court found removal improper because most of the Companies' government business occurred outside the relevant time frame. The court further reasoned that Atlantic Richfield was under no obligation to comply with industrywide regulations, and regardless, was merely a supplier. As to DuPont, the court determined that the Residents were not suing DuPont over its Freon-12 production, citing the Residents' statement in their complaint that "[t]his action does not pertain to DuPont's manufacture and production of Freon-12 and the byproduct of hydrochloric acid."

These timely appeals followed.

## II. Discussion

"We review subject-matter jurisdiction and the propriety of the removal of a state-court action de novo. The party seeking removal bears the burden of establishing federal jurisdiction.… [T]he Supreme Court has made clear that courts must liberally construe § 1442(a)." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (citations omitted). We therefore evaluate the Companies' allegations in support of removal under the federal pleading standards, asking whether they are facially plausible. *See id.* at 1016.

Federal officer removal is appropriate when "the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Id.* at 1015. Recognizing our precedent on the matter, the Residents do not dispute that the Companies are persons under § 1442(a). *See Ruppel v. CBS Corp.*, 701 F.3d

1176, 1181 (7th Cir. 2012) (holding that corporations are persons within the meaning of the federal officer removal statute). Instead, the Residents focus on the Companies' purported failure to establish the third and fourth criteria and assert that Atlantic Richfield specifically does not meet the second criterion. We begin with the latter.

### A. Acting Under the Federal Government

The Residents contend that Atlantic Richfield must show substantially more than its wartime operation of a plant in a highly regulated industry to establish it acted under federal authority. They insist that most of the conduct Atlantic Richfield relies on to support removal is nothing more than its adherence to regulations that applied to all market participants. The crux of the inquiry under this element, however, is whether there was a special relationship between the defendant and the federal government. That the federal government may have had special relationships with other private entities because it was fighting a war is irrelevant.

"The relevant relationship," the Supreme Court has reminded us, "is that of a private person '*acting under*' a federal 'officer' or 'agency.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007) (quoting § 1442(a)(1)). Typically, "[t]hat relationship … involves subjection, guidance, or control. In addition, precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Id.* at 151–52 (citations and internal quotation marks omitted).

But "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply

*complying* with the law." *Id.* at 152. In *Watson*, the Supreme Court explained that

> a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Id.* at 153.

Notwithstanding that explanation, where a private contractor helps "the Government to produce an item that it needs[,] [t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks."[1] *Id.* To illustrate its point, the Supreme Court cited with approval *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir.

---

[1] The district court held that "mere assistance, in the absence of a legal duty to render such aid, does not bestow § 1442 jurisdiction." Like the Second Circuit, we "find no authority for the suggestion that a voluntary relationship somehow voids the application of the removal statute." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008); *see also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 473 (3d Cir. 2015) ("What matters is that a defense raises a federal question, not that a federal duty forms the defense. True, many removal cases involve defenses based on a federal duty to act, or the lack of such a duty. But the fact that duty-based defenses are the most common defenses does not make them the only permissible ones.") (citation omitted).

1998). The key circumstance in that case, which distinguished it from others with close supervision and detailed regulation, was that the private firm had "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war." *Watson*, 551 U.S. at 153–54. "Moreover," the Court reasoned, the company "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 154.

The same wartime context applies here. Atlantic Richfield (really, its predecessor ISR) provided the federal government with materials that it needed to stay in the fight at home and abroad—namely, lead, zinc oxide, and white lead carbonate, used in turn to manufacture products like rubber, paint, ammunition, die casts, and galvanized steel. In fact, ISR was under contract with the United States military itself for the procurement of zinc oxide. Without the aid of ISR, the government would have had to manufacture the relevant items on its own. For these reasons, this is not simply a case of compliance, but *assistance*.

To put it in the terms of our precedent, this appeal involves Atlantic Richfield "working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel*, 701 F.3d at 1181; *see also id.* ("'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Panther Brands, LLC v. Indy Racing League, LLC*, 827

F.3d 586, 590 (7th Cir. 2016) (referring to the required relationship as "closely monitored and highly regulated").[2] The government's detailed specifications for the makeup of ISR's materials, "the compulsion to provide the product to the government's specifications," and the continuous federal supervision all reveal the necessary relationship between ISR and the government. *Winters*, 149 F.3d at 400. Accordingly, Atlantic Richfield acted under federal authority.

### B. Acts for or Relating to Federal Authority

The question, then, is whether the polluting conduct the Residents complain of relates to the federal directives the Companies acted under. As we have previously noted, "this requirement is distinct from the 'acting under' requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage—there must be a 'causal connection between the charged conduct and asserted official authority.'" *Ruppel*, 701 F.3d at 1181 (quoting *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999)).

The Residents maintain that the Companies did not show a causal connection between their actions and federal mandates. Specifically, the Residents contend that the Companies have not shown that the Residents' injuries were caused by

---

[2] Contrary to the Residents' claims, our caselaw conforms with our sister circuits'. *See Isaacson*, 517 F.3d at 136–37 (observing that "close supervision of the private entity by the Government" may demonstrate that the entity is assisting the government); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.").

their wartime production for the government. The Residents, however, make the mistake of "demanding an airtight case on the merits in order to show the required causal connection." *Acker*, 527 U.S. at 432. The Supreme Court's jurisprudence teaches that the policy in favor of federal officer removal "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Imposing the Residents' unduly strict standard of causation would do just that.

Before 2011, removing defendants "were required to demonstrate that the acts for which they were being sued occurred at least in part *because of* what they were asked to do by the Government. In 2011, however, the statute was amended to encompass suits for *or relating to* any act under color of federal office." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*") (citations and internal quotation marks and brackets omitted).

Since then, three of our fellow circuits have concluded that, in the Removal Clarification Act, "Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc); *see also id.* at 296 ("Subject to the other requirements of section 1442(a), any civil action that is connected or associated with an act under color of federal office may be removed."); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) ("[T]here need be only '*a connection or association* between the act in question and the federal office.'") (citation omitted); *Def. Ass'n of Philadelphia*, 790 F.3d at 471 (holding the same).

Up until today, by contrast, we and the Eleventh Circuit have stopped short of abandoning the "causal connection" test, though we both had "essentially implemented a connection rationale for removal." *Latiolais*, 951 F.3d at 292; *see also id.* at 295 n.8 ("In part because these courts interpret the 'causal nexus' or 'causal connection' requirement more expansively—and more in line with [Supreme Court precedent]—than our court has done in recent cases, the outcomes in these cases have not been affected by failure to give effect to the new 'relating to' language in section 1442(a)."); *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 & n.8 (11th Cir. 2017) (similar). We see no need to do so any longer, however, and now join all the courts of appeals that have replaced causation with connection and expressly adopt that standard as our own.

This position better comports with the Supreme Court's decisions, which have never utilized a rigid causation standard for removal. Indeed, long before the Removal Clarification Act of 2011, the Court had opined that "the statute does not require that the [lawsuit] must be for the very acts which the [defendant] admits to have been done … under federal authority. It is enough that [the] acts … constitute the basis … of the state [lawsuit]." *Maryland v. Soper*, 270 U.S. 9, 33 (1926); *see also Acker*, 527 U.S. at 433 ("The circumstances that gave rise to the tax liability, not just the taxpayers' refusal to pay, 'constitute the basis' for the tax collection lawsuits at issue.") (citation omitted). Putting it another way, the Court has determined that it is "sufficient for [the defendant] to have shown that their relationship to [the plaintiff] derived solely from their official duties." *Willingham*, 395 U.S. at 409.

The Residents misunderstand these precedents. To be sure, they have raised serious questions about whether the Companies' pollution that allegedly caused the Residents' injuries flowed from the Companies' specific wartime production for the federal government or from their more general manufacturing operations outside those confines. But those are *merits questions* that a federal court should decide. *See id.* ("If the question raised is whether they were engaged in some kind of 'frolic of their own' in relation to respondent, then they should have the opportunity to present their version of the facts to a federal, not a state, court.").

For example, in *Winters*, the defendants had produced their goods before the federal government got involved. 149 F.3d at 399. Still, the Fifth Circuit did not make much of this fact because the government required a distinct formulation composed of a mixture unlike its commercial counterpart. *Id.* So too here. The Companies assert that their materials and manufacturing processes corresponded to detailed federal specifications and stayed under the tight control of the government. It rightly remains to be seen whether a connection or association exists between the Residents' health conditions and their alleged exposure to federally dictated chemicals or others.

Simply stated, the Companies did not need to allege "that the complained-of conduct *itself* was at the behest of a federal agency. It is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship" between the Companies and the federal government. *Def. Ass'n of Philadelphia*, 790 F.3d at 470; *see also Isaacson*, 517 F.3d at 137–38 ("To show causation, Defendants must only establish that the act that is

the subject of Plaintiffs' attack (here, the production of the by-product dioxin) occurred *while* Defendants were performing their official duties.").

Reaching the opposite result, the district court held that remand was appropriate because "the bulk of [the Companies'] operations occurred outside this [war]time period." In that court's judgment, the Companies did not have enough federal government contracts connected to or associated with this case to remove it. We see no support in the statute or precedent for this rule that a removing defendant must operate under government orders for most of the relevant time frame. It may make some sense, at least as a matter of policy, to require a removing defendant to allege more than a de minimis amount of federal transactions to establish jurisdiction. This is not the case in which to do so, however, given that the district court estimated that Atlantic Richfield's predecessor operated under government commands for 20% of the relevant time span and DuPont for 5-to-15% of the period.[3]

Assuming for the sake of argument that some of the Residents' allegations of soil contamination do not relate to the Companies' acts under color of federal office, "removal need

---

[3] Although the Residents purport to disclaim that their lawsuit is about DuPont's manufacture of Freon-12 for the government during this time, the fact is that DuPont alleges that its Freon-12 production resulted in waste streams that contained lead and arsenic. Those are the two main toxins the Residents claim harmed them. The Residents cannot have it both ways. Clearly, the parties dispute whether the Residents' injuries arise from products DuPont manufactured for the government. This is just another example of a difficult causation question that a federal court should be the one to resolve.

not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Sawyer*, 860 F.3d at 257; *see also Ruppel*, 701 F.3d at 1182 ("If CBS has a colorable defense as to either claim, then the entire case is removable."); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (rev. 4th ed. 2009) ("Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction.").

Similarly, even if the Residents eventually prove that the Companies' pollution occurred because of acts not directed by the federal government, it is still enough for the present purposes of removal that at least some of the pollution arose from the federal acts. *See Isaacson*, 517 F.3d at 138. Again, "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id.* The Companies' wartime production was a small, yet *significant*, portion of their relevant conduct. Giving the Companies the benefit of all reasonable inferences from the facts alleged, we conclude a "federal interest in the matter" supports removal. *Willingham*, 395 U.S. at 406 (citation omitted).

## C. Colorable Federal Defense

Lastly, we must determine whether the Companies have a colorable federal defense that entitles them to removal. "The government contractor defense, developed in *Boyle v. United Technologies Corp.*, [487 U.S. 500, 511–12 (1988),] immunizes

government contractors from state tort law when the government had a hand in a defendant's allegedly defective design." *Ruppel*, 701 F.3d at 1183. "The defense applies where (1) the federal government approved reasonably precise specifications, (2) the manufactured equipment conformed to the government's specifications, and (3) the contractor warned the federal government about the equipment's dangers that were unknown to the government." *Betzner*, 910 F.3d at 1016.

The district court declined to analyze the defense in any detail. Specifically, it neither reached the defense at all as to DuPont, nor addressed whether Atlantic Richfield could meet the third element of the defense (supplier warnings to the government). Consequently, for the purposes of this appeal, we assume that the Companies have colorable defenses. That said, we find it necessary to address the district court's apparent conclusion that Atlantic Richfield could not avail itself of the government contractor defense because it merely sold standard materials that were available across the general market. We cannot agree with this analysis.

The government contractor defense broadly applies to any product supplied for government use so long as it conformed to the government's "reasonably precise specifications." *Boyle*, 487 U.S. at 512. That is all that the defense requires when it comes to the nature or quality of the goods. It is undisputed that Atlantic Richfield is the putative successor to a company that adhered to detailed specifications (*e.g.*, exact physical and chemical properties) promulgated by the federal government for manufacturing certain materials in wartime. Atlantic Richfield has therefore set forth sufficient factual details regarding its government contractor defense.

Two recent federal appellate decisions do not persuade us otherwise. In *Mayor & City Council of Baltimore v. BP P.L.C.* ("*Baltimore*"), the Fourth Circuit concluded that simply selling the Navy Exchange Service Command ("NEXCOM") fuel for resale on Navy bases was insufficient to qualify for the defense and therefore removal. 952 F.3d 452, 463 (4th Cir. 2020), *petition for cert. filed* (U.S. Mar. 31, 2020) (No. 19-1189). As the court pointed out, the contracts at issue only involved "a standardized consumer product," undifferentiated from that supplied to civilians. *Id.* at 464. Likewise, in *County of San Mateo v. Chevron Corporation*—a case also involving the provision of fuel to NEXCOM—the Ninth Circuit determined that the fuel contracts at issue "evince[d] an arm's length business relationship to supply NEXCOM with generally available commercial products." — F.3d —, —, 2020 WL 2703701, at *8 (9th Cir. May 26, 2020). For that reason, the court held that the contractor defense, and accordingly removal, was unavailable to the defendants. *Id.*

Both factual situations are readily distinguishable from the one before us. Indeed, *Baltimore* explicitly differentiated the situation before it—the provision of fuel for resale to servicemen and women during peacetime—from those in *Winters*, where the defendant provided the means to engage in chemical warfare, and *Sawyer*, where the defendant provided specific component parts for use aboard military vessels. 952 F.3d at 463 (citing 149 F.3d at 390; 860 F.3d at 252). Similarly, *San Mateo* focused on the fact that the defendants supplied a product identical to that available to consumers. 2020 WL 2703701 at *8.

In this case, by contrast, at least some of ISR's production went directly to the United States military to support its efforts in World War II, and nearly all its production served as inputs to produce a wide variety of critical wartime supplies. The federal government dictated to whom and in what amounts ISR could sell its products, outside of the quota it reserved for itself, and it also set precise specifications for those final products. In these circumstances, it strains credulity to equate ISR to a fuel distributor operating in peacetime given it operated under such intense directives to produce specialty items according to precise specifications. The assertion that the production at issue in this case resulted from arms-length transactions for "off-the-shelf" goods like the fuel in *Baltimore* and *San Mateo* simply ignores the reality that, unlike in those cases, the government here all but nationalized ISR's production during World War II.

More importantly, the "off-the-shelf" theory elides the fact that, here, the government required ISR to produce the goods it did according to detailed specifications that differentiated those goods from the ones it supplied civilian consumers. *See, e.g., Isaacson*, 517 F.3d at 138 (rejecting plaintiffs' off-the-shelf theory because "commercially available products did not contain the Agent Orange herbicides in a concentration as high as that found in Agent Orange."). We can see the logic of withholding the government contractor defense from a supplier who provides what amounts to the same fuel as that available at any local gas station, but extending this reasoning and describing lead and other industrial products as "off-the-shelf" is a bridge too far for us to cross in this case. Consequently, the rationale of *Baltimore* and *San Mateo* does not apply here, and Atlantic Richfield has a colorable federal defense.

*              *              *

"At this point," it is worth remembering that "we are concerned with who makes the ultimate determination, not what that determination will be." *Ruppel*, 701 F.3d at 1182. This appeal, like others that come to us under the federal officer removal statute, presents "complex issues, but the propriety of removal does not depend on the answers." *Venezia v. Robinson,* 16 F.3d 209, 212 (7th Cir. 1994). Both the Residents and the Companies have reasonable theories of this case. Our role at this stage of the litigation is to credit only the Companies' theory. *See Acker*, 527 U.S. at 432. After reviewing their allegations and the applicable law, we conclude the Companies have made an adequate threshold showing to remove their case to federal court.

### III. Conclusion

For the reasons stated above, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.